THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
February 21, 2014

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Hitachi High-Technologies Corp.
_____

Serial No. 79110412
_____

Kumiko Ide of Westerman Hattori Daniels & Adrian, LLP, for
Hitachi High-Technologies Corporation.

Susan B. Allen, Trademark Examining Attorney, Law Office 101
(Ronald R. Sussman, Managing Attorney).
_____

Before Quinn, Ritchie, and Hightower, Administrative Trademark
Judges.

Opinion by Ritchie, Administrative Trademark Judge:

Hitachi High-Technologies Corporation ("applicant") filed

an application to register the mark OPTICROSS, in standard

character form on the Principal Register, for goods identified

as "liquid chromatography apparatus and parts thereof," in

International Class 9.[1]

The Trademark Examining Attorney refused registration of

applicant's mark under Section 2(d) of the Trademark Act of

_____

[1] Serial No. 79110412, filed February 1, 2012, pursuant to Section
66(a) of the Trademark Act, 15 U.S.C. § 1141f(a), based on
International Registration No. 1110080, registered February 1, 2012.

1946, 15 U.S.C. §1052(d), on the ground that applicant's mark so resembles the following seven previously registered marks owned by Optimize Technologies, Inc. ("Optimize") as to be likely to cause confusion, or to cause mistake, or to deceive when used on or in connection with applicant's identified goods:

1. OPTI, in typed drawing[2] format, for "liquid transfer components of chemical analysis equipment, namely High-Performance Liquid Chromatography (HPLC) - pistons and plunger seals for pumps; solvent reservoir filters; in-line filters; tubing; check valves; prime and purge valves; pump heads, precolumn filters; and fittings for tubing;"[3]

2. OPTI-MAX, in typed drawing format, for "check valves for High-Performance Liquid Chromatography (HPLC) pumps;"[4]

3. OPTI-SEAL, in typed drawing format, for "piston and plunger seals for High-Performance Liquid Chromatography (HPLC) pumps;"[5]

---

[2] Prior to November 2, 2003, "standard character" drawings were known as "typed" drawings. A typed mark is the legal equivalent of a standard character mark. Trademark Manual of Examining Procedure (TMEP) § 807.03(i) (October 2013).

[3] In International Class 9, Registration No. 2048831, issued April 1, 1997. Sections 8 and 15 acknowledged and accepted. Renewed.

[4] In International Class 9, Registration No. 2023739, issued December 17, 1996. Sections 8 and 15 acknowledged and accepted. Renewed.

[5] In International Class 9, Registration No. 2023740, issued December 17, 1996. Sections 8 and 15 acknowledged and accepted. Renewed.

4. OPTI-GUARD, in typed drawing format, for "precolumn filters and guard columns for High-Performance Liquid Chromatography (HPLC);"[6]

5. OPTI-SOLV, in standard character format, for "scientific instruments, namely, filters for sample preparation, and other analytical techniques involving filtration of solvents, mobile phases, and samples, for use in the fields of Liquid Chromatography (LC) and Mass Spectrometry (MS), as well as Liquid Chromatography/Mass Spectrometry (LC/MS) and fluid transfer in scientific instruments;"[7]

6. OPTI-PAK, in typed drawing format, for "scientific instruments, namely, capillary trap cartridges for High-performance Liquid Chromatography (HPLC) and other analytical techniques involving analyte trapping and sample purification;"[8] and

7. OPTI-SOLV, in typed drawing format, for "scientific instruments, namely, filters for High-Performance Liquid Chromatography (HPLC), Mass Spectrometry, sample

---

[6] In International Class 9, Registration No. 2100804, issued September 30, 1997.  Sections 8 and 15 acknowledged and accepted.  Renewed.

[7] In International Class 9, Registration No. 3511235, issued October 7, 2008.

[8] In International Class 9, Registration No. 2906256, issued November 30, 2004.  Sections 8 and 15 acknowledged and accepted.

Serial No. 79110412

      preparation, and other analytical techniques involving

      filtration of solvents, mobile phases, and samples."[9]

    The registration was also refused on the same statutory basis with respect to the previously registered mark OPTICHROM,[10] in typed drawing format, owned by Siemens Industry, Inc. for "chromatographic analyzers and control systems for same."

    Upon final refusal of registration, applicant filed a timely appeal. Both applicant and the examining attorney filed briefs.

    We base our determination under Section 2(d) on an analysis of all of the probative evidence of record bearing on a likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973); s*ee also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences

---

[9] In International Class 9, Registration No. 2906257, issued November 30, 2004. Sections 8 and 15 acknowledged and accepted.
[10] In International Class 9, Registration No. 0991331, issued August 20, 1974. Sections 8 and 15 acknowledged and accepted; twice renewed.

in the essential characteristics of the goods and differences in the marks").

We first address the refusal based on the seven marks owned by Optimize.  Each of the marks in the cited registrations owned by Optimize contains the term "OPTI" or "OPTI"+[term].  In the Office action dated May 22, 2012, the examining attorney referred to these cited registrations as a "family," stating: "Consumers will likely perceive applicant's mark, and applicant's goods, as belonging to registrant Optimize's existing family of 'Opti-' marks used with liquid chromatography parts."  Applicant objected to the examining attorney's reliance on a "family" of marks.  The examining attorney did not refer in further Office actions to the marks as being part of a "family," and in the March 21, 2013 Denial of Request for Reconsideration specifically retracted such reference, noting, however, that even without evidence of a "family," there was sufficient evidence in the record to justify a refusal.  (See also examining attorney's brief at unnumbered page 11 of 19).

A "family of marks" may be established in an inter partes proceeding where there is evidence that a group of marks having a shared characteristic are advertised and promoted together. *See J & J Snack Foods Corp. v. McDonald's Corp*., 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991); see also 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23.61

(4th ed. 2013).[11]  The mere existence of similar registrations does not establish a family, but rather there must be recognition by the public that the shared characteristic (or "family surname") is indicative of a common origin.  *Id.* However, it is not appropriate for an examining attorney, lacking the resources to establish a "family of marks," to make this reference during ex parte prosecution.  *See In re Mobay Chem. Co.,* 166 USPQ 218, 219 (TTAB 1970) ("In determining whether a 'family of marks' exists, it must be shown that a proprietary interest in the family characteristic exists but that depends upon fact and not supposition.  Such facts are not available to an examiner in the ex parte consideration of registrability and the mere fact of registration does not prove a 'family of marks.' . . . The conclusion by the examiner that the cited registered marks comprehended a family of marks constitutes error."); TMEP § 1207.01(d)(xi) (Oct. 2013 ed.) ("[E]xamining attorneys should refrain from invoking the family of marks doctrine or from referring to a family of marks in a

---

[11] The *du Pont* case mentions as its ninth confusion factor the variety of goods on which a cited registered mark is used or whether a family of marks exists.  177 USPQ at 567.  When a "family" of prior marks exists, this suggests consumers are more likely to be confused that an applicant's use of a similar mark is simply another member of the existing owner's "family."  *Cf. In re Wilson*, 57 USPQ2d 1863, 1867 (TTAB 2001) (registrant's uses of its mark on a variety of different fruits and vegetables suggested it was likely that purchasers, when encountering applicant's additional fruits would assume that a source, sponsorship or other connection exists).

likelihood of confusion analysis."). That is because establishing a "family" of marks requires a detailed assessment of not just the registrations, but, more importantly, of how the "family" is used in the marketplace.

Our primary reviewing court has noted that "[r]ecognition of the family is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family. It is thus necessary to consider the use, advertisement, and distinctiveness of the marks, including assessment of the contribution of the common feature to the recognition of the marks as of common origin." *J&J Snack Foods*, 932 F.2d 1460, 18 USPQ2d at 1891-92. Such an assessment of use in the marketplace is usually beyond the scope of an ex parte examination. Accordingly, it was appropriate for the examining attorney to retract the language referencing the various Optimize marks as a family and treating them as such.

Each cited registration must stand on its own as a basis for refusal under Section 2(d); and we note that the examining attorney properly set forth and discussed the *du Pont* factors in regard to Optimize's OPTI mark and registration. We find this mark to be the most relevant of Optimize's cited registrations for our *du Pont* analysis. Accordingly, if we find a likelihood of confusion as to OPTI, we need not find it as to the others. On the other hand, if we don't reach that conclusion, we would

not find it as to the other cited registrations either. *See In re Max Capital Group Ltd.,* 93 USPQ2d 1243, 1245 (TTAB 2010).

Looking to the goods, we note that the application identifies "liquid chromatography apparatus and parts thereof" while the OPTI registration identifies "liquid transfer components of chemical analysis equipment, namely High-Performance Liquid Chromatography (HPLC) - pistons and plunger seals for pumps; solvent reservoir filters; in-line filters; tubing; check valves; prime and purge valves; pump heads, precolumn filters; and fittings for tubing," which is encompassed by applicant's "parts thereof" and otherwise inherently related to applicant's "liquid chromatography apparatus." Applicant does not dispute that the goods are related, and indeed overlap.

Because the goods described in the application and the cited registration are legally identical, in that they overlap in part, we must presume that the channels of trade and classes of purchasers are the same. *See In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) ("The Board, therefore, was entitled to rely on this legal presumption in determining likelihood of confusion."); *see also In re Yawata Iron & Steel Co., Ltd.*, 403 F.2d 752, 159 USPQ 721, 723 (CCPA 1968) ("Here, as noted, we have legally identical goods, hence the same class of purchasers, and marks which are quite similar

8

in their essential features, as well as the fact that the goods as identified in the application are not restricted to any particular channel of distribution."). Additionally, there is nothing in the recital of goods in either the cited registration or the application that limits, respectively, registrant's or applicant's channels of trade. *Hewlett Packard Co. v. Packard Press, Inc.,* 281 F.3d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002) ("absent restrictions in the application and registration, goods and services are presumed to travel in the same channels of trade to the same class of purchasers."). Accordingly, we find that these *du Pont* factors weigh heavily in favor of finding a likelihood of confusion.

With regard to the marks, we note preliminarily that the more similar the goods at issue, the less similar the marks need to be for the Board to find a likelihood of confusion. *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992); *see also In re Mighty Tea Leaf*, 601 F.3d 1342, 94 USPQ2d 1257, 1261 (Fed. Cir. 2010). We consider and compare the appearance, sound, connotation and commercial impression of the marks in their entireties. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005).

In comparing the marks, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-

by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods and/or services offered under the respective marks is likely to result. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012); *San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977). The mark in the cited registration consists solely of the term OPTI, in typed drawing form. Applicant's mark incorporates in full this term as the first part of its mark OPTICROSS. Applicant argues that in fact its mark is the telescoped mark of "OPTIC"+"CROSS" not "OPTI"+"CROSS" and would thus be viewed and pronounced as such. However, we find that consumers are more likely to view and therefore pronounce applicant's mark as "OPTI"+"CROSS." In saying this, we note that it is well-settled that there is no correct way to pronounce a mark. *In re Teradata Corp.,* 223 USPQ 361, 362 (TTAB 1984). Rather, applicant's mark incorporates the first term from the cited registration, and adds the word "CROSS," which does not appear to have a connotation in relation to the identified goods. Our precedent instructs that adding a term to a shared first term does not necessarily obviate likelihood of confusion. *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944 (Fed. Cir. 2004) (GASPAR'S ALE and JOSE

GASPAR GOLD); *Cola-Cola Bottling Co. v. Joseph E. Seagrams & Sons, Inc.*, 526 F.2d 556, 188 USPQ 105 (CCPA 1975) (BENGAL and BENGAL LANCER); *Lilly Pulitzer, Inc. v. Lilli Ann Corp.*, 376 F.2d 324, 153 USPQ 406 (CCPA 1967) (THE LILLY and LILLI ANN); *In re U.S. Shoe Corp.*, 229 USPQ 707 (TTAB 1985) ("CAREER IMAGE" AND "CREST CAREER IMAGES"); *In re Riddle*, 225 USPQ 630 (TTAB 1985) ("ACCUTUNE" and "RICHARD PETTY'S ACCU TUNE").

Applicant argues that the "OPTI" or "OPTIC" prefix is weak. To this end, applicant has noted that the cited registrations, i.e., the Optimize OPTI mark and the Siemens OPTICHROME mark, both using the "OPTI" term, are owned by two separate registrants.  Applicant has also submitted third-party registrations from two other registrants[12] for the marks OPTIMA WAXPLUS[13] for "gas chromatography apparatus"; BIOOPTIX[14] for "chromatography instrument used for biochemical separations"; and COMBIFLASH OPTIX[15] for "chromatography instrument used for flash chromatography."  There are also definitions of record for "OPTI" and "OPTIC" as "optical"; "relating to the eye or vision."[16]  There is no indication that this small number of third-party registrations, or ascribing this "optical" meaning

---

[12] One other registration applicant submitted was not use-based.
[13] Registration No. 4153314, owned by Macherey-Nagel & Co.
[14] Registration No. 3054720, owned by Teledyne Isco, Inc.
[15] Registration No. 3057575, also owned by Teledyne Isco, Inc.
[16] See *www.acronymfinder.com; http//medicaldictionary.thefreedictionary.com.*

to the involved marks, would render the OPTI mark in the cited registration to be unduly weak.  The number of registrations, especially in the absence of evidence of use of the registered marks, is not such that we could conclude that consumers would be conditioned to distinguish "Opti" formative marks based on subtle differences.  Nor does the arguably suggestive meaning of "Opti" as a mark element necessarily limit the scope of protection that should be accorded the Optimize OPTI mark.

We find that any differences in commercial impression between applicant's OPTICROSS mark and the OPTI mark in the cited registration are outweighed by similarities in sight and sound.  This factor, too, weighs in favor of finding a likelihood of confusion.

Finally, applicant urges us to consider the degree of care that consumers will exercise in purchasing these goods.  We note that the evidence of record is not clear in this regard.  The evidence demonstrates that there are patents for parts and apparatus for "liquid chromatography."  *See* U.S. Patent No. 5,572,328.  The evidence also includes scientific articles discussing liquid chromatography, as well as some websites showing prices for parts therefore, indicating prices from $1,495 to the tens of thousands of dollars.  *See www.labmanager.com; www.analyticalinstruments.com.*  However, applicant has not included with the evidence any declaration to

12

give us insight into the purchasing process. *Cf. Edwards Life Sciences v. Vigilanz Corp.*, 94 USPQ2d 1399, 1413 (TTAB 2010).

Even accepting that the goods may be marketed to more careful purchasers, with some advanced knowledge of liquid chromatography, we note that with in-part identical goods and similar marks, even a careful, sophisticated consumer of these goods is not likely to note the differences in the marks. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 948-49, 55 USPQ2d 1842, (Fed. Cir. 2000); *Hydra Mac, Inc. v. Mack Trucks, Inc.*, 507 F.2d 1399, 184 USPQ 351 (CCPA 1975) ("the high cost of the goods does not necessarily decrease the likelihood of confusion where the confusion found to be likely is not as to the products but as to their source"). Furthermore, careful purchasers who do notice the difference in the marks will not necessarily conclude that there are different sources for the goods, but will see the marks as variations of each other, pointing to a single source. *See, e.g.*, *Kangol Ltd. v. Kangaroos U.S.A., Inc.*, 974 F.2d 161, 23 USPQ2d 1945, 1946 (Fed. Cir. 1992) ("What is important is not whether people will necessarily confuse the marks, but whether the marks will be likely to confuse people into believing that the goods they are purchasing emanate from the same source.") (citations omitted). Accordingly, we deem this *du Pont* factor to be neutral.

Finally, we note that, although we have not considered Optimize's marks under the rubric of a "family" of marks, it is, nonetheless, appropriate to note that consumers who may be familiar with various products in the Optimize product line, when confronted with applicant's mark, would be likely to view the goods marked therewith as additional products from registrant. One of the circumstances mentioned in the ninth *du Pont* factor is the variety of goods on which a prior mark is used. *See, e.g.*, *In re Wilson*, 57 USPQ2d 1863, 1867 (TTAB 2001) (use on a wide variety of goods weighs in favor of likelihood of confusion). While we have previously applied this factor to assess the variety of goods used under the same mark, we think it appropriate in the circumstances presented here to note the variety of chromatography-related goods offered under Optimize's various OPTI-formative marks.

In summary, we have carefully considered all of the evidence and arguments of record relevant to the pertinent *du Pont* likelihood of confusion factors. On balance, we find a likelihood of confusion between the marks.[17]

Decision: The refusal to register is affirmed based on a likelihood of confusion with the mark in Registration No. 2048831.

---

[17] Due to this finding, we do not analyze likelihood of confusion as to the remaining individual registrations owned by Optimize or the cited

Serial No. 79110412