49 CCPA

**SAKRETE, INC., Appellant,**

v.

**SLAG PROCESSORS, INC., Appellee.**

**Patent Appeal No. 6762.**

United States Court of Customs
and Patent Appeals.

July 18, 1962.

Truman A. Herron, Cincinnati, Ohio (Wood, Herron & Evans, Cincinnati, Ohio, of counsel) for appellant.

Charles B. Cannon, Chicago, Ill., Francis C. Browne, Mead, Browne, Schuyler & Beveridge, Washington, D. C., for appellee.

Before WORLEY, Chief Judge, RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

SMITH, Judge.

The issue in this opposition proceeding is whether appellee-applicant's mark "SLAGCRETE" [1] when applied to its "dry mixed concrete materials" so resembles appellant-opposer's registered mark "SAKRETE" [2] as to be likely to

---

\* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

1. Application Ser. No. 38,492, filed October 7, 1957.

2. Registration No. 373,104, registered November 28, 1939, republished under the Act of 1946, May 10, 1949, for "SACKS OF CONCRETE, EACH COMPRISING A COMMERCIAL PACKAGE CONCRETE AGGREGATE.", and Registration No. 568,874, registered January 6, 1953, for "MIXTURES OF CEMENT, SAND AND AGGREGATE, CEMENT

cause confusion, mistake or deception of purchasers. Petitioner's registrations both assert use of its mark since July 14, 1936. The earliest date of use asserted by applicant is July 16, 1957, some 21 years after registrant's first asserted date of use and some 17 years after the date of petitioner's first registration.

The present appeal is from a decision of the Trademark Trial and Appeal Board dismissing the opposition (127 USPQ 134), in which it was held:

"There can be no doubt but that the suffixes 'CRETE' and 'KRETE' are highly suggestive of concrete or any concrete product. The marks 'SAKRETE' and 'SLAGCRETE' otherwise are distinguishable in sound and appearance and create different commercial impressions, 'SAKRETE' suggesting concrete in a sack and 'SLAGCRETE' a concrete product containing slag. Considering therefore the suggestive nature of the suffixes 'CRETE' and 'KRETE' and the differences between the marks 'SAKRETE' and 'SLAGCRETE', it is concluded that confusion, mistake or deception of purchasers is not likely to occur."

Opposer established its ownership of the registrations in issue, took the testimony of three witnesses, and introduced several physical exhibits to support the averments in its notice of opposition. Applicant took no testimony. Its record consists of some 250 third party registrations in which the term "crete" (or "krete") is shown as part of marks used in fields as disparate as perfume, toilet water and cologne (Reg. No. 435,098, "Goddess of Crete"), brassieres, ladies' foundation undergarments, and ladies'

bathing suits (Reg. No. 580,618, "Tres Sea Crete"), aerial practice bombs made of concrete (Reg. No. 565,281, "Jet Crete") and waterproofing compositions, etc. (Reg. No. 555,541, "Resto-Crete" and design) but including some 32 registrations for goods similar in kind or competitive with the goods of the parties.[3]

A comparison of the respective marks in the light of the record and exhibits here establishes, we think, that the marks so resemble each other in sound, appearance and meaning that they are likely to cause confusion, mistake or deception of purchasers when used on applicant's goods.

As to sound and appearance, both marks are two syllable coined words ending in the phonetically identical suffixes "krete" and "crete." The prefixes both start with the letter "s" and contain a "short a" vowel.

Similarities in enunciation, expression and accent used by different persons pronouncing the marks may well be compounded by the hearing acuity, attention and background of the one hearing the marks. Thus, a housewife requested by her "do-it-yourselfer" husband, far into his job, with trowel in hand and pipe in mouth to "Pick me up a bag of 'SAKRETE'," might well have only the vaguest of notions of whether she is supposed to purchase "SLAGCRETE" or "SAKRETE." How much she might know about "slag" in "SLAGCRETE" may well depend on whether she has had previous contact with the vernacular of those geographic areas where slag is produced. We think it is unlikely that the confirmed "do-it-yourselfer" would be confused, for as the witness Mussett

AND SAND AND CEMENT, SAND AND MORTAR."

3. The inclusion of so many third party registrations, while indicating zeal on the part of counsel, is of little assistance to the court. Their value as "some evidence" in resolving the issues in opposition and cancellation proceedings becomes progressively less as they relate to fields as disparate as from that here

involved as "perfume," "brassieres," "ladies' bathing suits." At best, they establish nothing more here than what opposer should have been willing to admit, i. e., that the suffix "crete" (or "krete") alone does not have distinctiveness as a trademark indicating the source or origin of goods in the concrete business or in a business associated therewith.

stated in his testimony "To the average consumer, the word 'Sakrete' is thought of as the name given commonly to cement mixtures in bags."

While the two marks differ in details of appearance, it is thought that the resemblances outweigh these differences. It is not likely that the two marks will be subjected to a side-by-side comparison by the average purchaser. Such a purchaser will, therefore, be comparing the mark he sees with a mark he thinks he remembers seeing. The fallibility of memory as to details in such a situation is well known. As stated by this court in Wincharger Corporation v. Rinco, Inc., 297 F.2d 261, 49 CCPA 849:

> "* * * It should be remembered that purchasers usually do not have the opportunity to simultaneously compare two marks but must recall one or the other separately at different times which in this situation would make the avoidance of error quite difficult. Therefore, we believe that if the goods are similar the marks would cause confusion among purchasers."

We think, therefore, that it is likely that the similarities in the appearances of the marks will be dominant in the mind of the average purchaser and hence would be likely to cause confusion, mistake or deception as to the source or origin of the goods on which applicant's mark is used.

On first impression, the difference in meaning of the two marks seems rather clear. However, the testimony of Mussett,[4] a partner in Dry Mix Concrete Company one of the licensees of opposer, suggests that different impressions may be conveyed by the marks to those who are familiar with sales of such products and those who are the "average consumer." Thus, the mark "SAKCRETE" could convey the impression of a concrete product packaged in a sack while the mark "SLAGCRETE" would convey the impression of a concrete product containing slag. However, such meanings are not necessarily the meanings the average consumer would attach to the marks. It is evident on reflection the first impression that the difference in meaning of the two marks which would be recognized by those "qualified in the trade" is based on two assumptions which do not necessarily apply to the average consumer, (1) that the average consumer will translate "SAKCRETE" as a "sack of concrete" and, (2) that the average consumer will have such familiarity with the word "slag" that its meaning becomes dominant and distinctive in the mark "SLAGCRETE" which he will translate as "concrete containing slag."

Opposer's thorough and complete record establishes a long commercial "build up" and usage of its mark "SAKCRETE" which we think supports the statement of witness Mussett that the word "SAKCRETE" to the average consumer is the "name given commonly to cement mixtures in bags." For some 21 years, prior to applicant's adoption of its mark, opposer and its licensees had been actively promoting the mark "SAKCRETE" for its products which had been advertised and sold on a national scale as well as in foreign countries.[5] As found by the Trademark Trial and Appeal Board:

> "Opposer and its licensees produce in excess of ten million bags of 'SAKRETE' products per year.

---

4. He testified as follows:
"XQ 72. Now it is true, isn't it, that the word 'Slag' in 'Slagcrete' suggests something in a product that has some slag in it? Doesn't it? A. It does to me, yes.
"XQ 73. The name 'Sakrete', S-a-k-r-e-t-e, suggests something put up in a sack, doesn't it? A. Well, I will have to qualify that answer.
"Yes, it does, to myself, being a member of the sales staff, being familiar with it. To the average consumer, the word 'Sakrete' is thought of as the name given commonly to cement mixtures in bags.
"XQ 74. The word 'Sakrete' doesn't suggest anything that has any slag in it, does it? A. Not to a person qualified in the trade as myself, no."

5. Opposer's Exhibit 9, a copy of its "PROPOSED 1959 Media Budget," indicates a proposed total of $42,876.64 for magazine advertisement alone. The magazines

'SAKRETE' products are advertised in nationally distributed consumer publications through a program maintained jointly by opposer and its licensees. Opposer's licensees also advertise and promote 'SAKRETE' dry mix concrete materials within their territorial areas on radio and television programs, to a small degree in magazines, and through the distribution of point of advertising materials such as banners, signs, booklets, and the like. Additionally, many of their dealers advertise 'SAKRETE' products in newspapers and other local media. The expenditures for these purposes have been substantial."

We think opposer's record indicates that its mark "SAKRETE" has acquired such distinctiveness as an indicator of source or origin of opposer for sacks of mixtures of concrete, mortar, and allied products [6] that use by applicant of "SLAGCRETE" on its goods would make confusion of purchasers likely.

■ The foregoing conclusion is not entirely free from reasonable doubt and we have reached it in part by applying the established rule that such doubt should be resolved against the newcomer, whose "field of trade mark selection is not so limited as to require registration of a mark which sufficiently resembles an old and established mark as to likely result in confusion in trade." Dayton Rubber Co. v. General Felt Products Co., 223 F.2d 734, 736, 42 CCPA 1035, 1037.

The record clearly establishes diligent efforts on the part of opposer to create and maintain consumer good will in its mark.[7] We find no reason to assist applicant to share in this good will by permitting it to register a mark which, in its entirety, in sound, appearance, and likely consumer meaning so resembles op-

---

listed as "proposed media" include both magazines of general circulation such as "Life," "Look" and "Better Homes and Gardens" and magazines quite likely to be read by "do-it-yourselfers," such as "Popular Mechanics," "The Family Handyman" and "Home Improvement Ideas."

6. Opposer's president Avril testified:
"XQ 59. Well, do you have several different products that you sell under the trade-mark 'Sakrete'?
\* \* \* \* \* \*
"A. Yes. We have concrete mixtures, mortar mixtures, and there are allied products.
"XQ 60. Sand mixtures? A. Well, that's sand and cement. We would consider that a cement mortar or a masonry mortar; and there are other products that are allied, plaster mixtures, which are cementing materials, and aggregate, and we also have a black top, which is classified as an asphaltic concrete. The aggregate is bound together with some asphaltic material instead of cement, but it's within the same category of materials."

7. The testimony of witness Avril shows the extent of opposer's efforts to maintain uniform quality control over the products produced and sold by its licensees under the "SAKRETE" mark. Opposer's Ex-

hibit 1, a sample contract used by opposer for its license agreements, states in part:
"6. This contract may be cancelled by Licensee at any time upon thirty days' notice in writing to Licensor and may be cancelled by Licensor in accordance with the following provisions:
"(a) If Licensee fails to maintain the standard of quality provided herein with respect to any product sold under the 'SAKRETE' trade mark, then Licensor and Licensee shall use their best efforts cooperatively to discover and remove the cause of such failure. If after thorough investigation and adequate opportunity to discover and remove such cause Licensor is of the opinion that it is impossible for Licensee to meet such quality standards with the material and equipment available to it or that Licensee is not in good faith attempting to meet such quality standards, then Licensor may notify Licensee in writing of its intention to cancel this contract, specifying therein the ground on which the asserted right of cancellation is based. \* \* \*"
Avril's testimony also shows that the mark "SACKONCRETE," Ser. No. 267,-995 for a product similar to opposer's was cancelled on a petition of opposer. This cancelled registration is included in the numerous third party registrations made of record by appellant.

poser's long established and registered mark.

For the foregoing reasons, we reverse the decision of the Trademark Trial and Appeal Board.

Reversed.

WORLEY, Chief Judge, concurs in result only.

MARTIN, Judge, sat but did not participate in decision.