# This Opinion is a
# Precedent of the TTAB

Mailed: May 27, 2014

**United States Patent and Trademark Office**

Trademark Trial and Appeal Board

————

*In re Gina Davia*

————

Serial No. 85497617

————

Melissa Rhoden of Thomas|Horstemeyer LLP, representing Gina Davia.

Marcie R. Frum Milone, Trademark Examining Attorney, Law Office 116 (Michael W. Baird, Managing Attorney).

————

Before Bucher, Wolfson, and Lykos, Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

Gina Davia ("applicant") seeks registration on the Principal Register of the mark depicted below for goods identified as: "condiment, namely, pepper sauce," in International Class 30.[1]



---

[1] Application Serial No. 85497617 was filed on December 16, 2011, pursuant to Section 1(a) of the Trademark Act based on an allegation of first use of the mark on August 17, 2011 and first use in commerce on August 19, 2011.

The description of the mark statement reads: "The mark consists of a stylized snake forming a circle in an Aztec art style. Across the snake is the stylized text 'CHANTICO' above the stylized text 'PEPPER SAUCE'. There is a dot on each side of the letter 'T' in 'CHANTICO' and after each letter 'P' in 'PEPPER'."

The words "Pepper Sauce" in the mark have been disclaimed. Color is not claimed as a feature of the mark.

The Trademark Examining Attorney has refused registration of applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), contending that applicant's use of her mark on the identified goods is likely to cause confusion with the previously registered mark **CHANTICO** (standard character form) for "agave sweetener" in International Class 30.[2]

When the refusal was made final, applicant appealed and filed a request for reconsideration. After the examining attorney denied the request for reconsideration, the appeal was resumed. We affirm the refusal to register.

## Applicable Law

Our determination under Trademark Act § 2(d) is based on an analysis of the probative facts in evidence that are relevant to the factors bearing on a likelihood of confusion. *In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also Palm Bay Imp., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003); *In re Dixie*

---

[2] Reg. No. 3901565; registered January 4, 2011.

*Rests. Inc.,* 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997). In considering the evidence of record on these factors, we keep in mind that "[t]he fundamental inquiry mandated by Section 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976). *See also In re Azteca Rest. Enters., Inc.,* 50 USPQ2d 1209 (TTAB 1999).

    A. <u>Comparison of the Marks</u>

In comparing the marks, we must consider the marks in their entireties as to appearance, sound, connotation and commercial impression, to determine the similarity or dissimilarity between them. *In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (quoting *du Pont*); *Palm Bay,* 73 USPQ2d at 1692; Trademark Manual of Examining Procedure ("TMEP") § 1207.01(b)-(b)(v) (April 2014). Similarity in any one of these elements may be sufficient to find the marks confusingly similar. *In re White Swan Ltd.,* 8 USPQ2d 1534, 1535 (TTAB 1988); *In re 1st USA Realty Prof'ls, Inc.,* 84 USPQ2d 1581, 1586 (TTAB 2007); TMEP § 1207.01(b). The test, under the first *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. *Coach Services Inc. v. Triumph Learning LLC,* 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012). *See also In re Cook Medical Technologies LLC,* 105 USPQ2d 1377, 1381 (TTAB 2012); *Edom Laboratories Inc. v. Lichter,* 102 USPQ2d 1546, 1551 (TTAB 2012). In making this determination, we

recognize that purchasers have fallible memories. *See, e.g., San Fernando Elec. Mfg. Co. v. JFD Electronics Components Corp.*, 565 F.2d 683, 196 USPQ 1, 2-3 (CCPA 1977); *Neutrogena Corp. v. Bristol-Myers Co.*, 410 F.2d 1391, 161 USPQ 687, 688 (CCPA 1969); *Sakrete, Inc. v. Slag Processors, Inc.*, 305 F.2d 482, 134 USPQ 245, 247 (CCPA 1962); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975).

We readily acknowledge that there are some dissimilarities in appearance between the marks because applicant's mark includes the design of a snake in an Aztec art style. Applicant argues that the impression made by the snake design is "more significant in creating a commercial impression because it is the most *visually prominent and conspicuous* feature"[3] (emphasis in original) and that when the marks are compared in their entireties, there is no likelihood of confusion. The examining attorney argues in response that the dominant feature of applicant's mark is the word "Chantico," given that "pepper sauce" is the generic name for the goods, the raised dots are mere decorative additions, the snake design is somewhat obscured by the words, and that "consumers would not call for the goods by saying 'the sauce with the stylized snake forming a circle in an Aztec art style.'"[4]

While we must consider a mark in its entirety, one feature may be recognized as being more significant than other elements. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("[I]n articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for

---

[3] *Applicant's Appeal Brief,* at 9; 14 TTABVUE 10.

[4] *Examining Attorney's Brief,* at 7 (unnumbered); 16 TTABVUE 7.

rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties."). In this case, the word "Chantico," stands out from the rest of applicant's mark. It appears in large letters, squarely in the center of the mark, and is big enough to cover up the snake design at two points, causing the design to visually recede and form part of the background of the mark. The snake design also curls around the word "Chantico," thereby creating a visual focus to the word. In addition, we find that the snake design is so highly stylized that it does not appear to us, as a matter of commercial impression, to immediately give rise to the realization that it is a serpent. Rather, that realization appears only after some degree of, and time for, scrutiny. Moreover, as the examining attorney points out, consumers tend to remember words rather than designs in marks because they use the words to refer to or call for the goods. Thus, consumers will recall the word "Chantico," more readily than the highly stylized snake design. *See In re Viterra Inc.*, 101 USPQ2d at 1911; *In re Dakin's Miniatures, Inc.*, 59 USPQ2d 1593, 1596 (TTAB 1999) ("It is the word portion of the marks which is most likely to be impressed upon a customer's memory as it is used by prospective purchasers when asking for applicant's and registrant's goods.").

We note that the cited registration is for the mark CHANTICO (in standard characters), and applicant's mark incorporates the registered mark CHANTICO in its entirety. The word "Chantico" also makes a stronger impression than the disclaimed wording "pepper sauce," which appears in much smaller lettering than

does the word "Chantico," and comprises the generic name for the goods. "That a particular feature is descriptive or generic with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark." *National Data*, 224 USPQ at 751. *See also, e.g., In re Dixie Rests., Inc.,* 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997) ("DELTA," not the disclaimed generic term "CAFE," is the dominant portion of the mark THE DELTA CAFE). *Compare Clinton Detergent Co. v. Procter & Gamble Co.,* 302 F.2d 745, 133 USPQ 520, 522-23 (CCPA 1962) (where the added word simply describes a use for the product (JOY vs. CARJOY detergent), it does not serve to lessen the likelihood of confusion) *with Clayton Mark & Co. v. Keystone Brass and Rubber Co.,* 279 F.2d 279, 126 USPQ 259, 260 (CCPA 1960) (where the added word(s) or letters are not simply descriptive or suggestive, but are more distinctive (MARK vs. SUMARK for plumbing-related goods), they may prevent confusion). As for the raised dots and periods in the mark, they are unpronounceable and contribute very little to the overall commercial impression of the mark.

Moreover, because CHANTICO is registered in standard character form, we are required to consider, when comparing the marks, the various ways in which the registrant could depict its mark. Although we acknowledge that such analysis would not extend to include consideration of that term combined with a snake design, registrant is entitled to protection of its mark CHANTICO in any font style, size, or color, including a stylization that uses the font style employed by applicant, and therefore we must consider its mark as though it were depicted in such font

style. *Citigroup Inc. v. Capital City Bank Group Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1258-59 (Fed. Cir. 2011). *See also In re Viterra Inc.*, 101 USPQ2d at 1909 ("[T]o the extent that the Board simply held that a standard character mark is not limited to any particular font, size, style, or color, it is entirely consistent with our case law, the relevant regulations, and the TMEP.").

As to sound, we note that the term CHANTICO is identical in both the cited mark and in applicant's mark and therefore likely will be pronounced the same. The meaning of the word CHANTICO, to the extent it is known to the relevant public, is also the same for both marks: it is the name of an Aztec goddess.[5] For these consumers, an awareness that the Aztec culture thrived in Mexico[6] and that both agave and chili pepper plants are grown in and associated with the country of Mexico[7] would lend a similar connotation to each usage of CHANTICO. For those members of the purchasing public who are unfamiliar with the derivation of CHANTICO, they may ascribe no meaning to either mark, such that CHANTICO would be viewed as the same arbitrary term.

---

[5] CHANTICO is identified as the name of an Aztec mythological goddess on applicant's Facebook page, attached to the examining attorney's June 12, 2013, denial of applicant's request for reconsideration.

[6] An "Aztec" is defined as "a member of a Nahuatl-speaking people that founded the Mexican empire conquered by Cortes in 1519." At *http://www.merriam-webster.com*. The Board may take judicial notice of dictionary definitions that appear in printed publications, including online dictionaries with regular fixed editions. *In re Red Bull GmbH,* 78 USPQ2d 1375 (TTAB 2006); *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.,* 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

[7] *See* the entry entitled *"Hot Sauce,"* at *http://en.wikipedia.org/,* including an extensive discussion on hot sauce and the chili peppers from which it is made, including those from Mexico. Also at the website is an entry defining "agave nectar" as "a sweetener commercially produced in South Africa and Mexico from several species of agave." *Attachment to Applicant's Response* dated September 17, 2012.

In sum, applicant's mark is dominated by the word CHANTICO, which forms the entirety of the registered mark, and both marks are similar in their overall appearance, pronunciation, connotation and commercial impression. Accordingly, the first *du Pont* factor weighs in favor of a finding of likelihood of confusion.

B. Strength of the Cited Mark CHANTICO

In order to determine the conceptual strength of the cited mark, we evaluate its intrinsic nature, that is, where it lies along the generic-descriptive-suggestive-arbitrary (or fanciful) continuum of words. Here, the cited mark CHANTICO has been registered on the Principal Register without a claim that the term has acquired distinctiveness, thereby showing that it has been viewed as inherently distinctive. Moreover, as the name of an Aztec mythological goddess, CHANTICO is clearly not descriptive, or even highly suggestive, of food products. Nothing in the record indicates an alternative meaning for the term that would suggest otherwise. *Cf. Citigroup Inc. v. Capital City Bank Group, Inc.* 94 USPQ2d 1645, 1664 (TTAB 2010) (the term "City Bank" is used by others to convey alternative meanings; no likelihood of confusion found between CITIBANK and CAPITAL CITY BANK), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011). Applicant has also not shown the existence of other registrations for the term, apart from the cited registration, that could demonstrate that CHANTICO conveys a high degree of suggestiveness. *Cf. Institut National Des Appellations D'Origine v. Vintners International Co.,* 958 F.2d 1574, 22 USPQ2d 1190, 1196 (Fed. Cir. 1992) ("[T]hird party registrations … may show that a particular term has descriptive significance

as applied to certain goods or services."). Accordingly, CHANTICO is considered arbitrary and strong in relation to the goods in the application and registration.

C. The Number and Nature of Similar Marks in Use on Similar Goods

We may also look to evidence pertaining to the number and nature of similar marks in use on similar goods "to show that customers have become so conditioned by a plethora of such similar marks that customers 'have been educated to distinguish between different marks on the bases of minute distinctions.'" *Palm Bay*, 73 USPQ2d at 1694 (Fed. Cir. 2005) (internal citations omitted). Here, there is no record evidence of any third-party use of CHANTICO marks or marks similar to CHANTICO that might show the cited mark to be commercially weak or diluted by the existence of other similar marks in use in the marketplace. *Cf. In re Hartz Hotel Services Inc.*, 102 USPQ2d 1150 (TTAB 2012) (marks comprising term "Grand Hotel" for hotels accorded narrow scope of protection in view of numerous third-party uses of GRAND HOTEL for hotel services); *In re Broadway Chicken, Inc.*, 38 USPQ2d 1559, 1565 (TTAB 1996) (evidence of third-party use of the term "Broadway" for restaurant services was so common that consumers would look to the other elements of applicant's mark BROADWAY CHICKEN to distinguish the source of the goods from BROADWAY PIZZA and BROADWAY BAR & PIZZA). Because of the lack of evidence regarding this *du Pont* factor, we treat it as neutral.

D. Comparison of the Goods

We evaluate the goods as they are identified in the registration ("agave sweetener") and application ("condiments, namely, pepper sauce"). *Dixie Rests.*, 41 USPQ2d at 1534. *See also Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d

1261, 62 USPQ2d 1001 (Fed. Cir. 2002); *Octocom Systems, Inc. v. Houston Computers Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). "When analyzing the similarity of the goods, 'it is not necessary that the products of the parties be similar or even competitive to support a finding of likelihood of confusion.'" *Coach Services*, 101 USPQ2d at 1722 (citation omitted). The goods need only be sufficiently related that consumers would be likely to assume, upon encountering the goods under similar marks, that the goods originate from, are sponsored or authorized by, or are otherwise connected to the same source. *See id.*

Both agave sweeteners and pepper sauce are used as condiments, defined in Webster's dictionary as "something (such as salt, mustard, or ketchup) that is added to food to give it more flavor."[8] Thus, they are functionally related. Pepper sauce and agave sweeteners are also commonly used together, and "conjoint use is a fact proper to be considered along with other facts present in particular cases." *Sholl Dental Laboratory Co. v. McKesson & Robbins, Inc.,* 150 F.2d 718, 66 USPQ 223, 226 (CCPA 1945). *See also In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984) ("The extent to which particular food products are deemed related will depend on the facts of each individual case. In the instant case, we take notice that the products 'bread' and 'cheese' are often used in combination. Such complementary use has long been recognized as a relevant consideration in determining a likelihood of confusion."). To illustrate that the goods add flavoring to similar foods, and would thus be used together, the examining

---

[8] At *www.merriam-webster.com*. *See Stewart-Warner Corp. v. U.S.,* 748 F.2d 663, 669 (Fed. Cir. 1984) ("We take judicial notice of the common dictionary definition of 'bicycle' ….").

attorney has submitted copies of web pages showing that the products are often

called for as ingredients in the same recipes. For example,[9]

1. A mixed drink recipe utilizing tequila and labeled *Another Sangarita Recipe* calls for "grenadine or **agave** nectar to sweeten" and "hot **pepper sauce** to taste." At http://www.tequilaconnection.com.

2. A recipe for *BBQ Baked Beans (Sugar-Free)* calls for "¼ cup **agave** nectar" and "1 dash hot **pepper sauce**." At http://www.yummly.com.

3. A recipe for *Agave Chicken Wings* calls for "½ cup **agave**" and "8 drops hot **pepper sauce**." At www.dvo.com.

4. *EverFit Turkey Meatloaf* utilizes "blue **agave** sweetener or brown sugar" and "red **pepper sauce**." At http://www.everfitfitness.com.

5. Global Goods Inc. lists a recipe for *Agave BBQ Sauce* that includes "½ cup volcanic **agave** nectar" and "dash cayenne pepper or bottled hot **pepper sauce**." At http://www.globalgoods.com.

6. *Cozy Cashew Chili,* provided by Nature Isle Tropical Gourmet, calls for "1 teaspoon mango **pepper sauce**" and "1 teaspoon **agave** nectar." At http://www.natureisletropicalgourmet.com.

7. Pillsbury's *Chicken Empanada Cones* recipe calls for "4 teaspoons **agave** sweetener or honey" and "1 teaspoon red **pepper sauce."** At http://www.pillsbury.com.

8. A book of recipes entitled "Homemade Soda," which includes a recipe for "hot pepper syrup" that is made with just two ingredients: **pepper sauce** and **agave syrup.** At http://books.google.com.

---

[9] Example numbers 1-2 and 9 were attached to the Office action dated March 31, 2012. The remaining examples, except for example No. 8, were attached to the Office action dated October 31, 2012. That one was attached to the examining attorney's June 12, 2013, denial of applicant's request for reconsideration.

9. On one website, headed "An Inspired Cook," a recipe for *Verde Wings with Cilantro Dipping Sauce* includes the following picture of the necessary ingredients for the wing sauce showing a bottle of organic agave nectar alongside a bottle of Tabasco brand green pepper sauce.[10] http://aninspiredcook.wordpress.com



There is, of course, no *per se* rule that all food products appearing in the same recipe be considered related for Section 2(d) purposes. It is not unusual for recipes to contain many different ingredients and consumers are not likely to assume merely from the fact that two items are called for in the same recipe that they necessarily emanate from the same source of origin. If two ingredients, however, are found to be complementary in that they are sold in the same stores to the same consumers for the same, related or complementary end use, consumers are likely to be confused upon encountering the goods under the same or similar marks even though the goods may be found in different areas within a store. Here, the recipes submitted by the examining attorney show that pepper sauce and agave nectar are complementary since, in preparing certain foods and beverages, where the combination of sweet and hot flavors is common, pepper sauce and agave nectar are frequently blended together for flavor. *See In re Vienna Sausage Mfg. Co.*, 230

---

[10] Attached to the examining attorney's March 31, 2012, Office action.

USPQ 799, 799-80 (TTAB 1986) (sausage and cheese related based in part on copies of pages from cookbooks containing recipes for dishes having cheese and sausage as principal ingredients); *In re Decombe*, 9 USPQ2d 1812, 1815 (TTAB 1988) (fresh produce is complementary to biscuits, cookies, wafers and candy because they are served and eaten together); *McCormick & Co., Inc. v. Granny Goose Foods*, 144 USPQ 449 (TTAB 1964) (applicant's use of GOLDEN WEST for potato chips likely to cause confusion with opposer's GOLDEN WEST for seasonings such as celery salt, horseradish, and onion or onion juice, due to "characteristics of conjoint use which may result in their being purchased at the same time to be used together").

The evidence also supports our finding that a consumer would be likely to encounter one product while purchasing the other. Because both products have been shown to be used for the same purpose (as a flavoring) in the same recipes, consumers are likely to purchase the products at the same time and in the same stores, where they may be sold or displayed near each other. In this regard, the examining attorney has shown that agave sweeteners and pepper sauce are sold online by the same grocery stores such as Wegmans, Giant, and Safeway.[11] *See Martin's Famous Pastry Shoppe,* 223 USPQ at 1290 (that the respective products may well be sold in "close proximity" to one another supports conclusion that confusion is likely); *cf. In re Sela Prods., LLC*, 107 USPQ2d 1580 (TTAB 2013) (purchasers are likely to encounter both surge protectors, and wall mounts and brackets, during course of purchasing a television, audio or home theater system);

---

[11] Submitted with the examining attorney's October 31, 2012, Office action.

*In re Melville Corp.,* 18 USPQ2d 1386, 1388 (TTAB 1991) (women's shoes are complementary to women's clothing because they may be part of a coordinated outfit); *Polo Fashions, Inc., et.al. v. La Loren, Inc.,* 224 USPQ 509, 511 (TTAB 1984) ("[A] person purchasing products for use in the bath could very well look for [applicant's] bath sponges, as well as [opposer's] bath oil, soaps and the like.").

Finally, we note the following evidence in the record further supports our conclusion that the goods are related: registrant's website suggests using its CHANTICO sweetener with "sauces, such as BBQ, stews and meat glazes;"[12] an online menu from the Sonora restaurant in New York offering cocktails lists a margarita mixed with agave nectar and chipotle pepper sauce;[13] several makers of pepper sauce also use "agave" as an ingredient;[14] and the examining attorney

---

[12] Submitted with applicant's September 17, 2012, response.

[13] At *http://www.sonorarestaurant.net*. Attached to the March 31, 2012, Office action.

[14] For example:

1. At http://highriversauces.com, the High River Sauces Company advertises "Hellacious Hot Sauce" from habanero peppers, vinegar, **agava**, Chipotle peppers, lime juice and garlic.

2. At http://www.armadillopepper.com, Armadillo Pepper offers "pura vida chili pepper sauce" made from peppers and "sweet organic **agave.**"

3. At http://screamindemonfieryfoods.com, "Screamin Demon Fiery Foods" advertises "a non-extract hot sauce" that mixes peppers and **agave** with vinegar, lime, coriander and salt.

4. At http://www.tabanero.com, Tabanero Hot Sauce Picante is advertised as "tangy with a hint of sweetness from the **agave** nectar, mixed with the perfect amount of heat … ." Lists "all natural ingredients" of habanero peppers and **agave** nectar, plus carrots, onions, key lime juice, garlic, salt and grapefruit seed extract.

These references were attached to the June 16, 2013, denial of applicant's request for reconsideration.

submitted copies of two third-party registrations, based on use, showing that a single mark has been registered for pepper sauce and natural sweeteners.[15]

We acknowledge applicant's argument that disparate food items often appear in the same recipes and yet would not be considered related even if sold under a single mark. As we noted *supra,* the mere appearance of different items in a recipe will not necessitate a finding that the goods are related. In support of its contention that the goods at hand are unrelated, applicant has submitted copies of third-party registrations for the mark SUNSHINE, showing that the mark has been registered by several different parties for various food products, including sweetened condensed milk, evaporated milk, crackers, pickles, and vodka. Applicant further introduced excerpts from *www.allrecipes.com* indicating that milk and crackers, for example, are both listed in the same recipes.[16]

We accord this evidence little probative value. While we readily acknowledge that the mere presence of two food items in the same recipe does not *per se* make them complementary or related, the comparisons between milk, crackers, pickles,

---

[15] Registration No. 3616895 for the mark PRODRY includes, *inter alia,* "dried or powdered food products, namely, dried or powdered natural sweeteners, … pepper sauce …."; registered May 5, 2009; use in commerce since September 24, 2007, claimed. Registration No. 3868774 for the mark HIMAX includes "honey; molasses for food; sugar; natural sweeteners; … condiments, namely, pepper sauce …."; registered October 26, 2010; use in commerce since July 16, 2010, claimed. These registrations were submitted with the March 31, 2012, Office action.

We acknowledge that these registrations list "natural sweeteners," rather than "agave" *per se*, but the record shows that agave is a natural sweetener. We also note that while the examining attorney submitted additional registrations, these were either based on Section 66(a) or Section 44 of the Trademark Act, and in one of the use-based registrations, the relevant goods had been cancelled. Such registrations have no probative value, and we have not considered them.

[16] Submitted with applicant's April 29, 2013, request for reconsideration.

and vodka, on the one hand, and pepper sauce and agave sweetener on the other, are by their very nature incomplete. Pepper sauce and agave sweeteners are both condiments in the nature of flavoring additives, which typically are not consumed by themselves, unlike the foods and drinks sold under the SUNSHINE mark. More importantly, each case must be assessed on its own merits, and whether the term "Sunshine" is indicative of any feature or characteristic of the goods, or has been weakened by third-party use, is unknown, whereas the mark CHANTICO clearly is arbitrary and strong. Moreover, several of the SUNSHINE registrations are owned by the same company; and we have no way of knowing whether any of the owners of the other SUNSHINE marks are likewise related or have entered into consent-to-use agreements permitting use of the mark on the various products. In short, that a variety of "Sunshine-formative" trademarks have been registered for an array of foods and beverages sheds absolutely no light on the question of whether pepper sauce is related to agave sweetener.

Applicant further argues that a proper focus on the relevant purchaser would reveal no likelihood of confusion, because consumers searching for a condiment to add hot spice to food would not select a sweetener. However, the issue is not whether consumers would confuse the goods themselves, but rather whether they would be confused as to the source of the goods. *See, e.g., J. C. Hall Co. v. Hallmark Cards, Inc.*, 340 F.2d 960, 144 USPQ 435, 438 (CCPA 1965); *Joel Gott Wines LLC v. Rehoboth Von Gott Inc.,* 107 USPQ2d 1424, 1431 (TTAB 2013); *In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984). That these two distinct condiments, pepper sauce and

agave nectar, serve to flavor foods differently does not avoid a likelihood of source confusion.

In view of the above, we find that both pepper sauce and agave sweetener are readily perceived as flavor additives, are used as ingredients in the same food and beverage recipes, are likely to be purchased at the same time and are sold by the same vendors. They are therefore related in the mind of the consumer. The second *du Pont* factor weighs in favor of a finding of likelihood of confusion.

E. Channels of Trade and Classes of Consumers

There are no restrictions in the channels of trade for the goods as stated in the application or the cited registration. Accordingly, we must presume that the goods would be sold in all ordinary channels of trade for those goods and be sold to all relevant classes of purchasers. *See Hewlett-Packard Co.*, 62 USPQ2d at 1005; *Octocom*, 16 USPQ2d at 1787. Applicant argues that its pepper sauce is a "specialty food product [sold] in a niche market" whereas agave sweetener is more "generic,"[17] but applicant has demonstrated neither. The balance of the evidence of record is likewise inconclusive on this point; it shows only that the goods are sold through the same online grocery stores, but not that they are displayed on the same web page. What the evidence does show, however, is that members of the general public can purchase both products through, at least, online grocery stores, and can use both products in a single recipe. Thus, the classes of consumers are the same. To this extent, we find this *du Pont* factor favors a finding of likelihood of confusion.

---

[17] Applicant's April 29, 2013, request for reconsideration.

F. Purchaser Sophistication

Applicant argues that there is a vast variety of pepper sauces, each having a unique flavoring and taste, unlike agave sweeteners, which are essentially used as a sugar substitute and have only one basic taste. Because of this, applicant argues that her purchasers are discriminating and brand-loyal, whereas purchasers of agave, as with sugar, "would likely choose the least expensive sweetener, regardless of brand."[18] There is no support in the record for applicant's assertion; to the contrary, both pepper sauce and agave sweeteners are relatively inexpensive items that would tend to be purchased without much care by members of the general public. Applicant's website advertises her product at $4.00 for a single bottle; $10.00 for three bottles.[19] The pages from the Giant, Safeway, and Wegmans online stores, printed out by the examining attorney, advertise similar-sized bottles of both pepper sauces and organic agave sweetener (the registrant's website indicates that its agave sweetener is "100% organic") for under $10 per bottle.[20] Generally, casual purchasers of low-cost, every-day consumer items exercise less care in their purchasing decisions and are more likely to be confused as to the source of the goods. *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669, 223 USPQ 1281 (Fed. Cir. 1984); *Eveready Battery Co. v. Green Planet* Inc., 91 USPQ2d 1511 (TTAB 2009). The facts of record do not convince us that consumers of pepper sauces would necessarily make careful, as opposed to casual, purchases. Moreover,

---

[18] Applicant's Brief at 16; 14 TTABVUE 17.

[19] At *http://chanticopeppersauce.com*. Attached to June 12, 2013, denial of request for reconsideration.

[20] Attached to Office action dated October 31, 2012.

we must base our decision on the least sophisticated potential purchasers. *See, e.g., Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, ___ F.3d ____, 110 USPQ2d 1157, 1163-64 (Fed. Cir. 2014); *Giersch v. Scripps Networks Inc.,* 90 USPQ2d 1020, 1027 (TTAB 2009). This *du Pont* factor favors a finding of likelihood of confusion.

G. <u>Balancing the factors.</u>

The cited mark CHANTICO is arbitrary and inherently strong. The word forms registrant's entire mark and comprises the dominant portion of applicant's mark. Overall, the marks are confusingly similar. The goods are complementary and related, and may be sold through similar channels of distribution to the same customers, who would exercise an ordinary level of care in making their purchasing decisions. The relevant customers, upon encountering applicant's mark for her pepper sauce, are likely to mistakenly believe these goods emanate from the same source as registrant's CHANTICO agave sweetener.

***Decision***: The refusal to register applicant's mark  is affirmed.