# United States Court of Appeals for the Federal Circuit

---

(Serial No. 77/608,885)

**IN RE VITERRA INC.**

---

2011-1354

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board.

---

Decided: March 6, 2012

---

SCOT A. DUVALL, Middleton & Reutlinger, of Louisville, Kentucky, for appellant.

RAYMOND T. CHEN, Solicitor, United States Patent and Trademark Office, of Alexandria, Virginia for appellee. With him on the brief were CHRISTINA J. HIEBER and FRANCES M. LYNCH, Associate Solicitors.

---

Before DYK, MOORE, and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

Viterra Inc. ("Viterra") appeals the decision of the Trademark Trial and Appeal Board ("the Board") affirming the examining attorney's refusal to register the trademark XCEED, in standard character form, for

"agricultural seed." The examining attorney refused registration under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), finding that Viterra's XCEED mark was likely to cause confusion with the previously-registered word and design mark for "agricultural seeds" shown below:



*See* U.S. Reg. No. 3,339,424 (hereinafter, "the X-Seed Mark"). The Board affirmed the examining attorney's refusal based on the identical nature of the goods involved, the similarity of the marks, and the overlapping trade channels and classes of potential consumers. Because we find that the Board's factual findings are supported by substantial evidence, and we agree that Viterra's XCEED mark is likely to cause confusion with the X-Seed Mark, we affirm.

BACKGROUND

On November 6, 2008, Vittera filed an intent-to-use application under 15 U.S.C. § 1051(b) to register the mark XCEED for "agricultural seed." *See* U.S. App. Serial No. 77/608,885 (Joint Appendix ("J.A.") 20-25). Viterra applied to register the mark in standard character form, "without claim to any particular font, style, size, or color." *Id.* at 23. *See also* 37 C.F.R. § 2.52(a).

The trademark examining attorney refused registration under Section 2(d) of the Lanham Act, finding that it was likely to cause confusion with the previously-registered X-Seed Mark, shown above, for "agricultural

seeds," which is owned by X-Seed, Inc. The X-Seed Mark is registered in special form as a word and design mark and, according to the registration, "consists of the stylized letter X and the surrounding dots appears [sic] in red and the term '-Seed' is black and outlined in gray." U.S. Reg. No. 3,339,424 (J.A. 36-38). In its registration, X-Seed, Inc. claims the colors black, red, and gray as a feature of the X-Seed Mark, and it disclaims exclusive rights to the term "seed" apart from the mark as shown pursuant to 15 U.S.C. § 1056. *Id.* In his final refusal, the examining attorney found a likelihood of confusion between the applied-for mark and X-Seed Mark after concluding that "[t]he goods are identical," and that "[t]he marks are phonetic equivalents" and "visually similar." U.S. App. Serial No. 77/608,885 (Final Refusal Sept. 4, 2009) (J.A. 48).

Viterra appealed the refusal to the Board, which affirmed the examining attorney's decision. The Board found that confusion with the X-Seed Mark was likely after giving "heavy weight" to the identical nature of the goods. *In re Viterra Inc.*, 2011 WL 526100, at *6 (T.T.A.B. Jan 21, 2011) ("*Board Decision*"). In addition, because neither the XCEED application nor the X-Seed registration limited the channels of trade or classes of purchasers, the Board presumed that the goods travel in the same trade channels and are bought by the same classes of purchasers. *Id.*, at *2. As to similarity, the Board found that the literal portion of the X-Seed Mark, not the design portion, was the dominant part of the mark, and that "[t]he literal portion of registrant's mark, X-SEED, sounds identical or, at the very least, virtually identical to applicant's mark XCEED." *Id.*, at *5. The Board also found that "both marks are likely to be perceived as a play on the commonly known and understood word 'exceed,' conveying the same laudatory suggestion." *Id.*

With respect to appearance, the Board applied its "reasonable manners" standard, explaining that, "when an applicant seeks registration of its word mark in standard characters, 'then the Board must consider all reasonable manners in which those words could be depicted.'"[1] *Id.*, at \*3 (quoting *INB Nat'l Bank v. Metrohost, Inc.*, 22 USPQ2d 1585, 1588 (T.T.A.B. 1992)). Under this standard, the Board found that one reasonable variation of XCEED could include a large capital letter "X" followed by "ceed" in smaller letters, which would resemble the X-Seed Mark. *Id.* at \*3. In so finding, the Board clarified that, "[b]y saying this, we do not mean to suggest that the specific special form of registrant's mark in its entirety constitutes a 'reasonable' variation of applicant's standard character mark. We acknowledge that registrant's mark is highly stylized, with colors." *Id.*, at \*5. Accordingly, based on the identical nature of the goods involved, overlapping trade channels and potential consumers, and the similarity of the marks, the Board concluded that "purchasers familiar with registrant's agricultural seed sold under the mark X-SEED and design would be likely to mistakenly believe, upon encountering applicant's mark XCEED for agricultural seed, that the goods originated with or are somehow associated with or sponsored by the same entity." *Id.* at \*6. Based on this conclusion, the Board affirmed the examining attorney's refusal to register XCEED.

Viterra timely appealed to this court, and we have ju-

---

[1]  After the Board issued its decision, this court rejected the "reasonable manners" standard as not being supported by statute, regulation, or this court's case law, and finding that it unnecessarily "limits the range of marks considered in the *DuPont* analysis." *Citigroup Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 1353 (Fed. Cir. 2011). Below, we address the impact of the *Citigroup* decision on this case.

risdiction under 28 U.S.C. § 1295(a)(4)(B). The parties waived oral argument.

## STANDARD OF REVIEW

We review the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *In re Mighty Leaf Tea*, 601 F.3d 1342, 1346 (Fed. Cir. 2010). The Board's determination of likelihood of confusion is a legal determination, *id.*, as is "its interpretations of the Lanham Act and the legal tests it applies in measuring registrability." *In re Save Venice New York, Inc.*, 259 F.3d 1346, 1351-52 (Fed. Cir. 2001). The ultimate question of likelihood of confusion, however, is based upon factual underpinnings that we review for substantial evidence. *In re Mighty Leaf Tea*, 601 F.3d at 1346. For example, the question of similarity between two marks and the relatedness of goods are factual determinations. *See Shen Mfg. Co. v. Ritz Hotel, Ltd.*, 393 F.3d 1238, 1241 (Fed. Cir. 2004). Within the broader question of the similarity of the marks, determinations as to the appearance, sound, connotation and commercial impression of the marks are also factual in nature. *See Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1337 (Fed. Cir. 2001) ("The Board's finding that the marks are similar in sound is a factual determination."); *Champagne Louis Roederer, S.A. v. Delicato Vineyards*, 148 F.3d 1373, 1375 (Fed. Cir. 1998) (referring to "the Board's factual findings with respect to the dissimilarities of the marks in appearance, sound, significance, or overall commercial impression"). We will not disturb such factual findings if they are supported by substantial evidence in the record. *Han Beauty*, 236 F.3d at 1337.

Substantial evidence is "'more than a mere scintilla' and [is] 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *In re*

*Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)). Accordingly, "[w]here two different conclusions may be warranted based on the evidence of record, the Board's decision to favor one conclusion over the other is the type of decision that must be sustained by this court as supported by substantial evidence." *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 970 (Fed. Cir. 2007).

## DISCUSSION

Under Section 2(d) of the Lanham Act, registration of a mark must be refused if it:

> so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1052(d). Whether a likelihood of confusion exists is determined on a case-by-case basis aided by the application of factors our predecessor court set out in *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973). "Not all of the *DuPont* factors are relevant to every case, and only factors of significance to the particular mark need be considered." *In re Mighty Leaf Tea*, 601 F.3d at 1346. In this case, the Board considered the *DuPont* factors relating to the similarity and nature of the goods, the similarity of trade channels, and the similarity of the marks.

On appeal, Viterra concedes that the goods at issue are identical. In addition, although Viterra challenges the Board's reliance on overlapping trade channels and prospective purchasers as not being "of record," it is well established that, "absent restrictions in the application

and registration, goods and services are presumed to travel in the same channels of trade to the same class of purchasers." *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1268 (Fed. Cir. 2002) (citing *CBS Inc. v. Morrow*, 708 F.2d 1579, 1581 (Fed. Cir. 1983)). The Board, therefore, was entitled to rely on this legal presumption in determining likelihood of confusion. The parties do not present arguments as to any of the other *DuPont* factors. Accordingly, the only factor that we need to address, and the focus of Viterra's appeal, is the *DuPont* factor relating to the similarity of the marks.

Viterra makes three arguments as to why its XCEED mark and the registrant's X-Seed Mark are dissimilar: (1) the marks are different in appearance because the X-Seed Mark includes a distinctive design and color claims, and Viterra's standard character mark should not be construed so broadly as to cover that distinctive form; (2) the marks are phonetically different because the sound of Viterra's mark is "exceed," whereas the X-Seed Mark is likely to be pronounced as two separate terms in succession: "X" and "seed"; and (3) the marks have different connotations because Viterra's mark will be construed as "exceeding" customers' expectations, whereas the focus of the X-Seed Mark is the "X," which is susceptible to several different meanings, such as the roman numeral, an unknown quantity, or shorthand for "cross." We address each argument in turn.

## I.

The relevant *DuPont* factor requires examination of "the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361. As is apparent from the plain language of this factor, marks must be viewed "in their entireties," and it is improper to

dissect a mark when engaging in this analysis, including when a mark contains both words and a design. *In re Shell Oil Co.*, 992 F.2d 1204, 1206 (Fed. Cir. 1993) ("The marks are considered in their entireties, words and design."). Although the court may place more weight on a dominant portion of a mark, for example if another feature of the mark is descriptive or generic standing alone, the ultimate conclusion nonetheless must rest on consideration of the marks in total. *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 1357 (Fed. Cir. 2000); *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985).

In the case of a composite mark containing both words and a design, "the verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed." *CBS*, 708 F.2d at 1581-82; *see also L.C. Licensing, Inc. v. Cary Berman*, 86 USPQ2d 1883, 1887, 2008 WL 835278, at *3 (TTAB 2008) ("[I]t is well settled that if a mark comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods."). Despite those statements, we also have cautioned that there is no general rule that the letter portion of the mark will form the dominant portion of the mark. *See In re Electrolyte Labs., Inc.*, 929 F.2d 645, 647 (Fed. Cir. 1990). Marks, therefore, must be considered on a case-by-case basis. Finally, where, as here, the goods at issue are identical, "the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992).

## A.

Viterra directs the majority of its argument to the appearance of the marks, arguing that the distinctive design

and color elements of the X-Seed Mark render it visually different from its XCEED mark. The Board rejected this argument, relying on the fact that Viterra applied to register its mark in standard character form and, thus, "without claim to any particular font, style, size, or color." *See* 37 C.F.R. § 2.52(a); Trademark Manual of Examining Procedure ("TMEP") § 1207.01(c)(iii) ("If a mark (in either an application or a registration) is presented in standard characters, the owner of the mark is not limited to any particular depiction of the mark."). Accordingly, the Board found that the standard character mark XCEED "could be depicted in a variety of reasonable variations, including a large capital 'X' followed by 'ceed' in smaller letters, that is, in a manner that resembles the format of the cited mark." *Board Decision*, at *5.

Viterra argues that the Board's decision misapplies 37 C.F.R. § 2.52(a) and TMEP § 1207.01, and that this court should clarify how standard character marks should be compared to registered design marks in a likelihood of confusion analysis. Specifically, Viterra argues that the court "should readdress and clarify *Citigroup* [*v. Capital City Bank Group, Inc.*, 637 F.3d 1344 (Fed. Cir. 2011)]," a case in which we rejected the "reasonable manners" standard the Board traditionally has used to determine the scope of standard character marks. We find that Viterra's arguments are without merit and that it is unnecessary to "readdress" *Citigroup*, even if we had the authority to do so.

First, to the extent the Board simply held that a standard character mark is not limited to any particular font, size, style, or color, it is entirely consistent with our case law, the relevant regulations, and the TMEP. *See In re Mighty Leaf Tea*, 601 F.3d at 1348 (rejecting an argument that the specific style of a registered mark could serve to distinguish the applicant's mark in standard character

form); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 950 (Fed. Cir. 2000) ("Registrations with typed drawings[2] are not limited to any particular rendition of the mark and, in particular, are not limited to the mark as it is used in commerce"); *Phillips Petroleum Co. v. C.J. Webb, Inc.*, 442 F.2d 1376, 1378 (CCPA 1971) (a drawing in typed letters "is not limited to the mark depicted in any special form"); 37 C.F.R. § 2.52(a) (providing rules for applicants "who seek to register words, letters, numbers, or any combination thereof without claim to any particular font style, size, or color"); TMEP § 1207.01(c)(iii) (same). Indeed, we previously have rejected an applicant's argument that its standard character mark was distinct from a mark registered in stylized lettering with a design. *See SquirtCo v. Tomy Corp.*, 697 F.2d 1038, 1041 (Fed. Cir. 1983) (rejecting argument that SQUIRT SQUAD in standard letters is distinct from SQUIRT registered in "distinctive lettering on a dark medallion"; "[b]y presenting its mark merely in a typed drawing, a *difference* cannot legally be asserted by that party" (emphasis in original)).

Although this court's *Citigroup* decision discarded the Board's "reasonable manners" standard after the Board issued its decision in this matter, *see* 637 F.3d at 1353, that holding does not change the outcome here. Indeed, our decision in *Citigroup* only broadens the potential variations of the standard character XCEED mark to be considered in the likelihood of confusion analysis and, if anything, makes the Board's decision less vulnerable to

---

[2]     As we noted in *Citigroup*, until 2003, "standard character" marks formerly were known as "typed" marks, but the preferred nomenclature was changed in 2003 to conform to the Madrid Protocol. *Citigroup*, 637 F.3d at 1352 n.1. Contrary to Viterra's argument, we do not see anything in the 2003 amendments that substantively alters our interpretation of the scope of such marks.

attack.

Viterra argues that this court should clarify that *Citigroup* does not apply to this case because *Citigroup* involved an *inter partes* opposition proceeding, whereas this is an *ex parte* examination case. According to Viterra, the "reasonable manners" standard is alive and well in *ex parte* examinations, and the Board misapplied that standard in this case. Viterra also asks this court to find that *Citigroup* does not apply when design marks are at issue. We decline Viterra's invitation on both fronts.

In *Citigroup*, we affirmed the Board's denial of an opposition seeking to prevent registration of the mark CAPITAL CITY BANK, in standard character form, based on an asserted likelihood of confusion with opposer's CITIBANK mark (and other CITI- prefix marks), also in standard character form. *Id.* at 1356. The Board, in reaching its decision, considered only the "reasonable manners" of depicting the standard character mark CAPITAL CITY BANK, and it found that minimizing "CAPITAL" and emphasizing "CITY BANK" would not be a reasonable manner of depicting the mark. Accordingly, it rejected the opposer's contention that the parties' marks were similar when compared in that manner.

Although we ultimately concluded that substantial evidence supported the Board's finding that the parties' marks were dissimilar, we rejected the "reasonable manners" test as unduly narrow and not required by statute, regulation, or our case law. We instructed that "[t]he T.T.A.B. should not first determine whether certain depictions are 'reasonable' and then apply the *DuPont* analysis to only a subset of variations of a standard character mark." *Id.* at 1353. Rather, "[t]he T.T.A.B. should simply use the *DuPont* factors to determine the likelihood of confusion between depictions of standard

character marks that vary in font, style, size and color and the other mark." *Id.* We noted, as we had in prior cases, that "illustrations of the mark as actually used may assist the T.T.A.B. in visualizing other forms in which the mark might appear." *Id.* Accordingly, our decision in *Citigroup* discarded the Board's "reasonable manners" standard in favor of a standard that allows a broader range of marks to be considered in the *DuPont* analysis when a standard character mark is at issue.

Viterra first attempts to avoid *Citigroup* by arguing that *Citigroup* involved an *inter partes* opposition proceeding, whereas this appeal derives from an *ex parte* examination. Viterra, however, offers no principled reason to make that distinction, and we see none. The analysis in both types of cases derives from the same statute, 15 U.S.C. § 1052(d), which forms the basis of both an examining attorney's refusal to register on likelihood of confusion grounds and an opposer's challenge on the same grounds. By analogy, there can be no doubt that the *DuPont* factors, which derive from 15 U.S.C. § 1052(d) and originated in the *ex parte* context, apply both in *ex parte* examinations and in *inter partes* proceedings. It would indeed be strange if a standard character mark were given a more limited view during *ex parte* examination than in *inter partes* proceedings, particularly since *inter partes* proceedings are intended to be a backstop for the examination process. *See In re Shell Oil*, 992 F.2d at 1209 ("The opposition procedure is intended to remedy oversight or error, not to substitute for the examination process."); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 20:2 (4th ed. 2011) (hereinafter "McCarthy") (opposition proceedings "provide a backstop to purely ex parte examination of trademark applications"). Accordingly, we find that the holding in *Citigroup* regarding the "reasonable manners" standard

applies equally in an *ex parte* examination context.[3]

We also see no reason why *Citigroup* would not apply to cases when a standard character mark is compared with a design mark or, as here, a word and design mark. There is no indication in *Citigroup*, or elsewhere in our precedent, that the analysis would be so limited. *See Citigroup*, 637 F.3d at 1353 (referring generally to comparisons between the standard character mark and "the other mark.") We assess the similarity of any two marks on a case-by-case basis, and that assessment necessarily takes into account whether one or both marks is in standard character form or contains a design feature. But that does not require us to alter the basic analysis when a standard character mark is compared with a stylized or design mark. Applying *Citigroup* to this case is also consistent with our prior case law, as well as Board precedent, comparing standard character marks with design marks. *See SquirtCo*, 697 F.2d at 1041; *see also In re Cont'l Graphics Corp.*, 52 USPQ2d 1374, 1376 (TTAB 1999) (finding that the standard character mark CONTINENTAL GRAPHICS was similar to the registered mark CONTINENTAL containing a globe design within a large letter "C" at the beginning of the mark).

In rejecting the "reasonable manners" test, we are not suggesting that a standard character mark encompasses all possible design elements of the mark. We leave for future cases to determine the appropriate method of comparing design marks with standard character marks. However, while we reject the "reasonable manners" test,

---

[3] As mentioned above, although the Board applied the now-defunct "reasonable manners" test in this case, that error was harmless because the Board's finding of a similarity between the XCEED mark and the X-Seed Mark is supported by substantial evidence even under that more restrictive test.

the Board's use of the test in its analysis was at best harmless error. The Board was careful to state that, "we do not mean to suggest that the specific special form of registrant's mark in its entirety constitutes a 'reasonable' variation of applicant's standard character mark." *Board Decision*, at *5. In other words, the Board did not find that the XCEED mark could be considered to have taken on the precise depiction shown in the cited registration, with full color and design; it only found that the XCEED mark could be depicted as a capital "X" followed by "ceed" in small letters, making it similar to the X-Seed Mark. Such a finding is not a departure from our case law and is not as remarkable as Viterra suggests.[4]

B.

Aside from the design features of the X-Seed Mark, Viterra also argues that the Board misconstrued the dominant portion of that mark, and that the correct analysis would reveal that the marks are dissimilar. When comparing the marks in this case, the Board found

---

[4] We also are not persuaded that the Board's decision in this case is inconsistent with its decision in *In re White Rock Distilleries, Inc.*, 2009 WL 4081675 (TTAB Aug. 11, 2009) (citable as precedent). In that case, the Board found that the standard character mark VOLTA for vodka was not confusingly similar with a word and design mark for wines, which depicted a design of a large vine shoot above the words TERZA with the word VOLTA below in smaller letters. *Id.*, at *1. The Board found that the standard character mark could not be extended to cover the separate design element appearing in the registrant's mark. *Id.*, at *2. Contrary to Viterra's suggestion, the Board in this case did not find that a reasonable manner of displaying XCEED included a display with the background dot design, as it expressly stated in the quote above. Accordingly, the Board's decision here is not in conflict with *White Rock*.

that the literal portion of the X-Seed Mark (i.e., the words "X-Seed") formed the dominant portion of the registrant's mark. Accordingly, the Board compared the literal portion of registrant's mark, "X-Seed," to the applicant's mark XCEED. Viterra argues that the dominant portion of the X-Seed Mark actually is the stylized letter "X" and cannot include "-Seed," particularly because the registrant used a hyphen to separate "X" from "Seed" and disclaimed the term "Seed." We do not agree.

Here, the design feature of the X-Seed Mark is not entirely distinct from the literal portion of the mark; rather, the color and design features are incorporated in the letter "X" and are covered in part by the "-Seed" portion of the mark. This is not a case, therefore, where a larger design is separate and independent from the literal features of the mark. The design itself is a stylized letter that overlaps with, and is covered by, other literal portions of the mark. Accordingly, the Board's determination that the entire literal portion "X-Seed" is the dominant portion of the mark, and not just the stylized "X," is supported by substantial evidence.

The Board's conclusion is also in line with our decisions holding that the verbal portion of a word and design mark likely will be the dominant portion. *CBS*, 708 F.2d at 1581-82 ("[T]he verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed."). This makes sense given that the literal component of brand names likely will appear alone when used in text and will be spoken when requested by consumers. *See id.* at 1582 ("This is particularly true when a mark appears in textual material, such as catalog descriptions, in which it is often impossible or impractical to include the design feature of the mark" (footnote omitted)); *In re Dakin's Miniatures, Inc.*, 59 USPQ2d 1593 (TTAB 2001) ("In the case of marks which consist of words

and a design, the words are normally accorded greater weight because they would be used by purchasers to request the goods."); *see also Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 796 F. Supp. 2d 458, 465 (S.D.N.Y. 2011) ("While a composite mark (consisting of both a word element and a design element) must be considered in its entirety, trademark law recognizes that the word portion is often more likely to be impressed upon a purchaser's memory because it is the word that purchasers use to request the goods and/or services.").

Although Viterra is correct that the registrant disclaimed exclusive rights to the term "-Seed", we previously have found that the dominant portion of a composite word and design mark is the literal portion, even where the literal portion has been disclaimed. *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570-71 (Fed. Cir. 1983) (finding that the term "GIANT" was the dominant portion of a mark consisting of the words GIANT HAMBURGERS with a large background design, even though the applicant disclaimed "GIANT HAMBURGERS."). In addition, in the ultimate determination of similarity of the marks, the Board must consider the X-Seed Mark in its entirety, including the disclaimed portion. *See Giant Food*, 710 F.2d at 1570 ("[I]t is well settled that the disclaimed material still forms a part of the mark and cannot be ignored in determining likelihood of confusion."); *see also* McCarthy § 19:72 ("For purposes of determining the likelihood of confusion of a mark with a registered composite mark of which portions are disclaimed, the disclaimed matter cannot be ignored."). As in *Giant Food*, the Board accorded greater weight to the literal portion of the mark, and we will not upset that factual determination.

C.

The remainder of Viterra's arguments merit little discussion. Viterra argues that XCEED and X-Seed are not phonetic equivalents because XCEED will be pronounced "exceed" with an emphasis on the second syllable (i.e., ik-SEED), whereas X-Seed will be pronounced with an emphasis on the first syllable (i.e., EKS-seed). Viterra presented dictionary evidence to the Board to support its contentions, but the Board made the factual finding that "it is hard to imagine that the two marks will not sound alike when spoken." *Board Decision*, at *5. Moreover, to the extent any minor difference in pronunciation existed, the Board was not persuaded that "any such difference would even be noticed by prospective purchasers when they hear the marks." *Id.* It is also true, as the Board recognized, that there is no correct pronunciation of a trademark, and consumers may pronounce a mark differently than intended by the brand owner. *See Interlego AG v. Abrams/Gentile Entm't Inc.*, 63 USPQ2d 1862, 1863 (TTAB 2002) (finding similarity between LEGO and MEGO, despite the applicant's contention that consumers would pronounce MEGO as "me go"). Given that, we think substantial evidence supports the Board's determination that any minor differences in the sound of these marks may go undetected by consumers and, therefore, would not be sufficient to distinguish the marks.

Finally, Viterra contends that the marks have different connotations because its XCEED mark will be construed by customers as "exceeding" their expectations, whereas the X-Seed Mark is subject to a variety of meanings, including the roman numeral for ten, an unknown quantity, or an abbreviation for "cross." The Board agreed that the meaning of registrant's mark is less clear than Viterra's mark, but nonetheless concluded that "it is reasonable that purchasers will perceive registrant's

mark in a similar manner, that is, purchasers may give the same meaning of superiority to registrant's mark." *Board Decision*, at \*5. Under our substantial evidence review standard, we do not upset the Board's finding on this point.

## II.

Viterra's arguments on appeal focus almost exclusively on the similarity of the marks at issue, but this is just one of three *DuPont* factors on which the Board based its decision. The Board also gave "heavy weight" to the identical nature of the goods involved in this case. *Id.*, at \*6. It is also well established that, when the goods at issue are identical, "the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21*, 970 F.2d at 877. In light of those considerations, although the marks involved are not identical, any minor differences between them are insufficient to outweigh the remaining factors that favor refusal of the registration in this case.

## CONCLUSION

For the reasons stated above, the decision of the Board is affirmed.

**AFFIRMED**