This Opinion is a
Precedent of the TTAB

Mailed: April 2, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*In re Aquitaine Wine USA, LLC*

———

Serial No. 86928469

———

Roxana Ahmadian of Law Offices Of Roxana Ahmadian
    for Aquitaine Wine USA, LLC.

Tabitha Messick, Trademark Examining Attorney, Law Office 104,
    Dayna Browne, Managing Attorney.

———

Before Ritchie, Wolfson and Adlin,
    Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

Aquitaine Wine USA, LLC ("Applicant") seeks registration on the Principal Register of the mark depicted below for "Wine of French origin protected by the appellation of the origin Cité de Carcassonne" in International Class 33. ("Cité de Carcassonne" disclaimed).[1]

---

[1] Application Serial No. 86928469 was filed on March 3, 2016, under Section 1(a) of the Trademark Act, based upon Applicant's allegation of first use of the mark on January 1, 2009 and first use of the mark in commerce on May 29, 2009. The description of the mark reads: "The mark consists of the words 'Laroque' and 'Cité de Carcassonne', and has a picture of a house behind a field of grape vines with trees bordering both the left and right sides of the



The Trademark Examining Attorney has refused registration of Applicant's mark under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), based on likelihood of confusion with Reg. No. 3449793 for the mark CHATEAU LAROQUE (in standard characters, "Chateau" disclaimed) for "Wines having the controlled appellation Saint-Emilion Grand Cru" in International Class 33.[2]

After the Trademark Examining Attorney made the refusal final, Applicant appealed to this Board and filed a request for reconsideration that was denied. We affirm the refusal to register.

*Likelihood of Confusion*

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In*

---

image." Color is not claimed as a feature of the mark, and the English translation of "Cité de Carcassonne" is "City of Carcassonne."

[2] Registered on the Principal Register on June 17, 2008, based on an extension of protection under § 66(a) of the Trademark Act, 15 U.S.C. § 1141(f), of French Reg. No. 0930101; Declaration of Use and/or Excusable Nonuse under Section 71 accepted September 22, 2017.

*re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See In re i.am.symbolic, llc,* 866 F.3d 1315, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017) ("The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but 'may focus … on dispositive factors, such as similarity of the marks and relatedness of the goods.'") (quoting *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002))); *In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945-46 (Fed. Cir. 2004); *Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

A. *The similarity or dissimilarity of the marks.*

We turn first to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *du Pont,* 177 USPQ at 567. In comparing marks, we are mindful that "[t]he proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (quoting *Leading*

*Jewelers Guild Inc. v. LJOW Holdings LLC,* 82 USPQ2d 1901, 1905 (TTAB 2007)); *see also San Fernando Elec. Mfg. Co. v. JFD Elec. Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Rests. Inc. v. Morrison Inc.,* 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd mem.,* 972 F.2d 1353 (Fed. Cir. 1992). The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *Geigy Chem. Corp. v. Atlas Chem. Indus., Inc.,* 438 F.2d 1005, 169 USPQ 39, 40 (CCPA 1971); *L'Oreal S.A. v. Marcon,* 102 USPQ2d 1434, 1438 (TTAB 2012). Because the goods at issue are French wines, but without any price points or other restrictions as to channels of trade, the "average customer" is an ordinary wine drinker.

The marks at issue are similar in sight and sound, since they share the term LAROQUE. To the extent LAROQUE has a meaning in connection with wine, it would have the same connotation in Applicant's mark as in Registrant's mark. According to the translation statement in the cited registration, this term has no meaning in a foreign language. The involved application does not include a translation statement nor does Applicant address the question. There is nothing in the record that otherwise indicates whether LAROQUE has a meaning, be it geographic, surname, or otherwise. Certainly, there is nothing on which we could conclude that the term is weak or not inherently distinctive and therefore entitled to only a narrow scope of protection.

In the case of marks, such as Applicant's, consisting of words and a design, the words are normally accorded greater weight because they are likely to make a greater

impression upon purchasers, to be remembered by them, and to be used by them to request the goods. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (citing *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 200 (Fed. Cir 1983)). The verbal portion of a word and design mark "likely will appear alone when used in text and will be spoken when requested by consumers." *Id*. at 1911; *see also In re Solid State Design Inc.,* 125 USPQ2d 1409, 1411 (TTAB 2018) (citing *L.C. Licensing, Inc. v. Berman,* 86 USPQ2d 1883, 1887 (TTAB 2007) ("[I]t is well settled that if a mark comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods.")). While Applicant's mark includes a design element, we find that the term LAROQUE is its dominant element. Displayed in a large, bold typeface, it comprises the largest literal portion of the mark in terms of size, position, and emphasis. It is also the first term in the mark, further establishing its prominence. *See Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) ("The presence of this strong distinctive term as the first word in both parties' marks renders the marks similar, especially in light of the largely laudatory (and hence non-source identifying) significance of ROYALE."); *Presto Prods. Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered"). There is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, such as a common dominant element, provided the ultimate conclusion rests on a consideration of the

marks in their entireties. *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

In sum, because of the position, size and bolding of the term LAROQUE, this single term dominates the commercial impression of Applicant's mark. Moreover, the wording "Cité de Carcassonne" is a geographically descriptive term, is in significantly smaller lettering, and has been disclaimed. Therefore, it is entitled to less weight in the likelihood of confusion determination. *See Bd. of Regents, Univ. of Tex. Sys. v. S. Ill. Miners, LLC,* 110 USPQ2d 1182, 1188 (TTAB 2014) ("[I]t is well-settled that disclaimed, geographically descriptive matter, such as the wording SOUTHERN ILLINOIS, may have less significance in likelihood of confusion determinations."); *Tea Board of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1899 (TTAB 2006) ("Geographically descriptive terms are generally regarded as inherently weak and entitled to less protection than arbitrary or suggestive marks."). The dominant element of Registrant's mark, CHATEAU LAROQUE, also is "Laroque." The term "Chateau," a common term for "a large French country house or castle often giving its name to wine made in its neighborhood,"[3] merely describes a location where wine is produced, and has also been disclaimed. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) ("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'") (quoting *In re Nat'l Data*, 224 USPQ at 752); *see also Citigroup Inc. v. Capital City Bank Group Inc.*, 637 F.3d

---

[3] Applicant's March 6, 2017 Request for Reconsideration at 42.

1344, 98 USPQ2d 1253, 1257 (Fed. Cir. 2011) ("[W]hen a mark consists of two or more words, some of which are disclaimed, the word not disclaimed is generally regarded as the dominant or critical term.") (citation omitted); *In re Binion*, 93 USPQ2d 1531, 1534 (TTAB 2009) (BINION'S, not disclaimed word ROADHOUSE, is dominant element of BINION'S ROADHOUSE); *In re Code Consultants, Inc.*, 60 USPQ2d 1699, 1702 (TTAB 2001) (disclaimed matter is often "less significant in creating the mark's commercial impression"). Furthermore, the word CHATEAU in the cited Registration does not distinguish the marks because the design element in Applicant's mark is that of a "chateau," which reinforces, rather than attenuates, the similarity of connotation between the marks, and consumers may thereby confuse Applicant's mark with the CHATEAU LAROQUE mark identifying Registrant's wines. *See, e.g.*, *Herbko Int'l*, 64 USPQ2d at 1380 ("This design connotes a crossword puzzle, which reinforces the connotation created by the words of the mark.").

Applicant argues that "wine consumers today pick their wine based on the image of the labels they browse"[4] and that "the dominant mark would be the design of the wine label as a whole."[5] Even if Applicant is correct, despite the lack of supporting evidence for this theory regarding consumer motivation, Applicant's mark is not the equivalent of a wine label, which necessarily contains more information pursuant to labelling requirements. *See* the Federal Alcohol Administration Act, 27 U.S.C. §§ 201-219a. Moreover, if the wine were ordered by the glass from a wine list, as in a

---

[4] Applicant's Brief, 7 TTABVUE 13-4.

[5] *Id*.

restaurant, which typically shows only the names of available wines, the image would not be available to the consumer. *Cf. In re Bay State Brewing Co.*, 117 USPQ2d 1958, 1961 (TTAB 2016) (when ordering from a bartender or restaurant server, "many consumers … will not have the opportunity to see a label."). Regardless, we do not consider how Applicant and Registrant actually use their marks in the marketplace, but rather how they appear in the registration and the application. We must compare the marks as they appear in the drawings, and not on any labels that may have additional wording or information. *See i.am.symbolic,* 123 USPQ2d at 1729 ("To the extent that Symbolic is advocating that we consider another mark, will.i.am, that is not part of the applied-for mark in analyzing the similarity of the marks, we decline to do so. The correct inquiry requires comparison of the applied-for mark, which only includes the words 'I AM,' to the registrants' marks."); *SCM Corp. v. Royal McBee Corp.*, 395 F.2d 1018, 158 USPQ 36, 37 n.4 (CCPA 1968) ("Certain exhibits reflect the parties' *current* practice of associating their house marks 'SCM' and 'Royal' with 'ELECTRA' and 'ELECTRESS', respectively. However, our concern here, of course, is whether 'ELECTRA', the mark actually registered, and 'ELECTRESS', the mark for which registration is sought, are confusingly similar when applied to the instant goods."); *Denney v. Elizabeth Arden Sales Corp.*, 263 F.2d 347, 120 USPQ 480, 481 (CCPA 1959) ("In determining the applicant's right to registration, only the mark as set forth in the application may be considered…."); *Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc.*, 253 F.2d 431, 117 USPQ 213, 214 (CCPA 1958) ("The fact that each of the parties applies an additional name or trademark to its

product is not sufficient to remove the likelihood of confusion. The right to register a trademark must be determined on the basis of what is set forth in the application rather than the manner in which the mark may be actually used.").

Trademark Rule 2.52(a), 37 CFR 2.52(a), requires that applicants "who seek to register words, letters, numbers, or any combination thereof without claim to any particular font style, size, or color must submit a standard character drawing that shows the mark in black on a white background." Thus, a "standard character mark," as envisioned by Trademark Rule 2.52(a), is a mark composed of "words, letters, numbers, or any combination thereof" that may be used in "any particular font style, size, or color." Since Registrant's mark is a standard character mark, we must consider that the literal elements of the mark (the words and the letters) may be presented in any font style, size or color, including the same font, size and color as the literal portions of Applicant's mark. This is because the rights associated with a standard character mark reside in the wording per se and not in any particular font style, size, or color. *Citigroup Inc. v. Capital City Bank Group Inc.,* 637 F.3d 1344, 98 USPQ2d 1253, 1259 (Fed. Cir. 2011) (registrant "entitled to depictions of the standard character mark regardless of font style, size, or color"); *see also Viterra,* 101 USPQ2d at 1909. For example, Registrant could choose to present CHATEAU in a much smaller size type or in a different font or color than the word LAROQUE, so that the latter term would be just as visually dominant as it is in Applicant's mark. *See In re Mr. Recipe, LLC,* 118 USPQ2d 1084, 1090 (TTAB 2016).

Applicant contends that the *Viterra* decision requires that the Board "must consider only reasonable variations in which [CHATEAU LAROQUE] could be depicted,"[6] and that the "Examining Attorney's position that the Registrant's mark could be presented in the same manner of display as Applicant's is legally impossible (as it would be copyright infringement of the artwork)."[7] The Examining Attorney, on the other hand, argues that "the standard character mark form is the broadest method of protection for trademarks,"[8] and that it is "reasonable to envision a use of registrant's mark with a depiction of any house and vineyard that may be confusing … without that depiction infringing on applicant's rights in the specific drawing of house and grapevines on its label, whatever it may be."[9] Despite both Applicant's and the Examining Attorney's reliance on a "reasonable manners" standard, the Federal Circuit did not establish such a rule in *Viterra*; to the contrary, the court rejected the "reasonable manners" test as "unduly narrow" and endorsed a standard "that allows a broader range of marks to be considered in the *DuPont* analysis when a standard character mark is at issue." *Viterra,* 101 USPQ2d at 1910. Despite this language, the *Viterra* court addressed only the fact that applicant's standard character mark could be depicted in the stylized fashion of the *literal* portion of registrant's design mark; the court did not extend that finding to the background "splatter" dot design of the

---

[6] Reply Brief, 10 TTABVUE 12.

[7] Applicant's Brief, 7 TTABVUE 17.

[8] Examining Attorney's Brief, 9 TTABVUE 9.

[9] *Id*.

registrant's mark. *Id.* at 1911 n.4. "In rejecting the 'reasonable manners' test, we are not suggesting that a standard character mark encompasses all possible design elements of the mark. We leave for future cases to determine the appropriate method of comparing design marks with standard character marks." *Viterra,* 101 USPQ2d at 1910.

This case presents such facts. We hold that when we are comparing a standard character mark to a word + design mark for Section 2(d) purposes, we will consider variations of the depictions of the standard character mark *only with regard to* "font style, size, or color" of the "words, letters, numbers, or any combination thereof." *See Citigroup*, 98 USPQ2d at 1259; *Viterra*, 101 USPQ2d at 1909. We hasten to add, however, that where, as here, we are comparing a mark in standard characters to a mark that includes a pictorial representation of that term, the fact that the word + design mark includes such a pictorial representation will be taken into account to determine likelihood of confusion in terms of the marks' overall connotation and commercial impression. Thus, in this case, the house design in Applicant's mark may be interpreted as a large estate home or "chateau" that would correspond to, or at least call to mind, the word CHATEAU in Registrant's mark. As we have found, the design and the word convey very similar commercial impressions. *See In re Rolf Nilsson AB*, 230 USPQ 141, 142 (TTAB 1986) ("[A] picture and the word that describes that picture are given the same significance in determining likelihood of confusion.") (citing *In re Serac, Inc.*, 218 USPQ 340, 341 (TTAB 1983)). We find that,

on the facts before us here, the design in Applicant's mark thus heightens the likelihood of confusion.

Bearing these principles in mind, when the marks CHATEAU LAROQUE and LAROQUE CITÉ DE CARCASSONNE and design are viewed in their entireties, we find they are partly similar in sound, more similar than dissimilar in appearance and convey similar connotations and commercial impressions. The first *du Pont* factor weighs in favor of a finding of likelihood of confusion.

*B. Similarities Between the Goods; Trade Channels and Classes of Consumers*

In making our determination under the second *du Pont* factor, we look to the goods as identified in the involved application and cited registration. *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1161-1162 (Fed. Cir. 2014); ("the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application"); *Octocom Sys., Inc. v. Houston Comps. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). We also make our determination regarding the channels of trade and classes of purchasers based on the goods as they are identified in the application and registration. *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002).

In this case, both Applicant and Registrant identify their goods as "wine." According to the identification in the application, however, Applicant's wine is restricted to French wine entitled to the appellation of origin Cité de Carcassonne

within the Languedoc wine region,[10] whereas Registrant's wines, according to its identification of goods, are entitled to the appellation Saint-Emilion Grand Cru.[11] While Applicant argues that "French consumers know that part of the French wine brand distinctiveness is each brand's ties to its specific region,"[12] only Applicant's mark reflects the geographic source of the goods. Registrant's mark itself does not indicate that its wine originates in Saint-Emilion, and although the respective identifications of goods include information about geographic origins, there is nothing in the record to show that Registrant's wines necessarily *must* display such terms. As a consequence, we cannot assume consumers of Registrant's wine would be apprised of that information. To the extent the identification of goods in the application and registration are restricted to wine from the respective regions, the general purchasing public thus may well be unaware of the identification of goods in either the application or registration and the restrictions are not controlling of public perception. *Cf., e.g., In re The Clorox Co.,* 578 F.2d 305, 198 USPQ 337, 340 (CCPA 1978) ("[T]he locus of potential confusion is [not] in the files of the PTO."); *In re Wada,* 48 USPQ2d 1689, 1692 (TTAB 1998) (public is unaware of disclaimers that "quietly reside" in the records of the Office). Moreover, if the term LAROQUE is associated

---

[10] According to "eatglobe.com," the appellation "Cité de Carcassonne" identifies a "Protected Geographical Indication" located in a very small area southeast of the city of Toulouse. At http://www.eatglobe.com, attached to June 20, 2016 Office Action at 22.

[11] The website "Terroir France" identifies "Saint-Emilion" as "the oldest wine area of the Bordeaux region." At http://www.terroir-france.com, *Id*. at 14.

[12] 7 TTABVUE 16.

with the city of "Carcassonne,"[13] then the same association would likely be present in Registrant's mark.

Even if Applicant's contention that "French wine brands are closely tied to their appellation"[14] is valid, we note that consumers often have a propensity to shorten marks when ordering them orally, and may order Registrant's wines, especially if purchased by the glass, under the designation LAROQUE alone. *See In re Mighty Leaf Tea,* 601 F.3d 1342, 94 USPQ2d 1257, 1260 (Fed. Cir. 2010) ("the Board found ... that ML is likely to be perceived as a shortened version of ML MARK LEES when used on the same or closely related skin care products. ... Avoidance of this kind of confusion about the provenance of goods is the very problem to which the Lanham Act was directed."); *Bay State Brewing,* 117 USPQ2d at 1961 (consumers may drop the highly descriptive term "Blonde" when calling for TIME TRAVELER BLONDE beer); *Big M. Inc. v. U.S. Shoe Corp.,* 228 USPQ 614, 616 (TTAB 1985) ("[W]e cannot ignore the propensity of consumers to often shorten trademarks...."); *Polo Fashions, Inc. v. La Loren, Inc.,* 224 USPQ 509, 512 (TTAB 1984) ("Lauren" is a shorthand term for Ralph Lauren). Further, even assuming that consumers intending to order Applicant's wine do not shorten the mark and call for the goods using the complete

---

[13] Applicant cites a Wikipedia article attached to its Request for Reconsideration that identifies the Cité de Carcassonne as "an obscure medieval citadel in the south of France." 7 TTABVUE 15, Request for Reconsideration at 43. Even if, as Applicant suggests, the article were to establish consumer exposure to a connection between a citadel and the appellation "Cité de Carcassonne," the article makes no mention of a winery, nor does it use the term "Laroque" in describing the region or the citadel. Additionally, the illustration in the article (presumably that of a citadel) bears no resemblance to Applicant's design.

[14] 7 TTABVUE 16.

literal portion of the mark, LAROQUE CITÉ DE CARCASSONNE, that does not obviate the likelihood of confusion. Consumers intending to order Registrant's wine may be unaware of its geographic origins, and may remember it as LAROQUE or CHATEAU LAROQUE. Upon encountering Applicant's mark bearing an image of a chateau and the term LAROQUE in large letters, these customers may mistakenly believe that they are being provided Registrant's wine. In any event, even if there were evidence that U.S. customers are aware that these wines come from different regions, they are still likely to assume that the wines share a common source or affiliation, particularly where, as here, the marks share a dominant, fanciful term. We are aware of no rule, and the record contains no evidence from which we can infer, that confusion is *not* likely when similar marks are used on wines from different viticultural regions, especially where, as here, those regions are in the same foreign country.

As Applicant acknowledges, the issue is not whether purchasers would confuse the goods, but whether there is a likelihood of confusion as to the source of the goods. *L'Oreal S.A. v. Marcon,* 102 USPQ2d at 1439; *In re Rexel Inc.,* 223 USPQ 830, 831 (TTAB 1984). Moreover, Applicant's assertion regarding "French" consumers' understanding of rules of appellation is, of course, irrelevant. The relevant purchasers are ordinary consumers in the United States who purchase wine, and the relevant inquiry is not whether such consumers can tell the wines apart but whether they are likely to mistakenly perceive that such different wines emanate from a single source. In this regard, Applicant has not submitted any evidence to support its

assertion that U.S. consumers are aware of differences in the specific appellations employed in French wine production. *See generally Stone Lion Capital*, 110 USPQ2d at 1163-64 (even though the seller may primarily target sophisticated potential purchasers, the analysis must focus on the "least sophisticated potential purchasers" of the goods or services); *Volkswagenwerk AG v. Rose 'Vear Enters., Inc.*, 592 F.2d 1180, 201 USPQ 7, 9 (CCPA 1979) (comparison of marks "must take into the account the commercial impressions of the marks on casual purchasers").

Here, the Examining Attorney has provided evidence that retail outlets sell wines bearing many companies' labels, and that consumers can shop online under a single website for a wide variety of different wines, including, on the same website, those from the regions of Saint-Emilion and the Cité de Carcassonne. For example, the website 1000corks.com offers consumers wines from both the Cité de Carcassonne region and Saint-Emilion. In particular, Applicant's "Domaine Laroque" Pinot Noir and "Domaine Laroque" Cabernet Franc are offered as well as several Bordeaux wines from other wineries.[15]

The Examining Attorney has also shown that wine purveyors sell French wine from different regions on the same webpage. At Buster's Liquors & Wines, French wine from different regions, including "Chateau Cruzeau Saint-Emilion" and Applicant's "Domaine Laroque Cité de Carcassonne," are offered on the same webpage:[16]

---

[15] At http://1000corks.com, September 7, 2016 Office Action at 24-30.

[16] At http://www.bustersliquors.com, *Id.* at 32-3.

**Serial No. 86928469**



Corkscrews
Gin
Cognac
Rosé Wine
Cheese
Armagnac
Water
Soda
Vinegar
Whiskey
Cordials

browse regions
France
  Bordeaux
  Languedoc-Roussillon
  Loire Valley
  South-West

browse by producer
( 1 2 3 9
A B C D E
F G H I J
K L M N O
P Q R S T
U V W X Y
Z

browse by price
Under $10
$10 to $25
$25 to $50
$50 to $75
$75 and over

**Château Saint Andre Corbin Saint Georges Saint Emilion 2012**
BN#544430

Price: $26.99
in mixed case $24.29
SKU 42905

ADD TO CART

**Chateau Cruzeau Saint Emilion 2011**
BN#561931

Price: $28.99
in mixed case $26.09
SKU 46193

ADD TO CART

**Château de Parenchere Bordeaux Superieur 2012**
BN#590116

Price: $18.99
in mixed case $17.09
SKU 39696

ADD TO CART
BUY A CASE

**Charles Joguet Chinon Cuvee Terroir 2010**
WS 92   WE 87

The sandy and alluvial terroirs of Cuvée Terroir offer fruity and supple wines to drink in their youth. Those who are convinced that the best Cabernet Franc grows in Bordeaux may quickly transfer their allegiance to the Loire upon tasting these classic, appellation-defining Chinons. The purity of fruit, the exceptional ... more

BN#471046

Price: $23.99
in mixed case $21.59
SKU 40124

ADD TO CART

**Domaine Laroque Cite de Carcassonne 2013**
BN#660976

Price: $12.99
in mixed case $11.69
SKU 42519

ADD TO CART
BUY A CASE

**Pensées de Lafleur Pomerol 1997**
BN#123755

Price: $159.99
in mixed case $143.99
SKU 23778

ADD TO CART

**Château Hosanna Pomerol 1999**
WA 90   BN#127836

Price: $149.99
in mixed case $134.99
SKU 26333

ADD TO CART



1 2 Next »

Likewise, Suburban Wines & Spirits advertises several wines together under the heading "France>Red Wine>Cabernet Franc."[17] The following webpage shows Applicant's "Domaine Laroque Cité de Carcassonne 2014" sold together with wine from various Bordeaux regions, such as "Chateau Mayne Durege Bordeaux 2012" and "Château de Bonhoste Bordeaux 2012":



---

[17] At http://www.suburbanwines.com, *Id.* at 34-5.



mixers
Prepared Cocktails

**Browse Types**

Argentina
California
Chile
France
    Bordeaux
    Languedoc-Roussillon
    Loire Valley
    Provence
    South-West
Italy
Other U.S.
South Africa

**Browse Types**

Under $10
$10 to $25
$25 to $50
$50 to $75
$75 and over

### Chateau Mayne Durege Bordeaux 2012
BN#597503

Price: $9.99
in mixed case  $8.49
SKU 53023

ADD TO CART
BUY A CASE

### Domaine Isle Saint Pierre Rouge 2015

Deep ruby. Aromatic nose with very spicy hints of curry, pepper, nutmeg and green pepper. Delicate and fresh but aromatic in-mouth texture with lingering taste of black fruit and licorice. Good with red meat, grilled meat  more

BN#599409

Price: $9.99
in mixed case  $8.49
SKU 53237

ADD TO CART
BUY A CASE

### Château de Bonhoste Bordeaux 2012

Lovely fresh, dense, clear ruby colour. The nose is characterized by acidulous, fresh red fruit, with chalky notes. Full bodied and refined in the mouth, well rounded and a little acidulous, with a pleasant persistent fruity aftertaste.  more

BN#569579

Price: $14.99
in mixed case  $12.74
SKU 50116

ADD TO CART
BUY A CASE

### Chateau La Braulterie Cuvée des David 2012

Although the winery has grown over many generations – now covering over 36 hectares. It is still family operated and certified organic.  more

BN#577029

Price: $14.99
in mixed case  $12.74
SKU 51034

ADD TO CART

### Chateau Barrail Meyney Bordeaux

A hop, skip and a jump away from Saint-Emilion lies the village of Geniesac. A 'simple' Bordeaux, it actually bears comparison with its better-known neighbours. A very high percentage of Merlot



The evidence from klwines.com shows that wine retailers sell wine from different regions, including wine from the Cité de Carcassonne and Saint-Emilion regions. On the first page is an advertisement for Hauts de Lalande wine from the Cité de Carcassonne:[18]

---

[18] At https://www.klwines.com, *Id.* at 37, 39, 43, 46, 48.



On another page, wines from Bordeaux are offered:



This evidence suggests that consumers are likely to find both Applicant's and Registrant's wine offered through the same types of retail outlets. Applicant argues

that "the Registered Mark could not have the words 'CITÉ DE CARCASSONNE' written on or near it because Chateau Laroque is not made in the city of Carcassonne. It will always have 'St. Emilion' or 'Saint Emilion' by its brand name instead, because that is the region from which Chateau Laroque originates."[19] Even if true, the record does not establish that a maker of wine in one region, such as the Cité de Carcassonne, could not also produce wine in another region, such as Saint-Emilion. Applicant further argues that "the Registered Mark would always have to have 'Saint Emilion' on the label where 'Chateau Laroque' is written because by law the appellation would have to be present on the label where the brand name is written."[20] Although wine labeling laws may require that wine from a particular region, if controlled, be labeled as such, Applicant has not shown that they would prevent a company doing business in one region from establishing a winery in a different region. Consumers who encounter wines from different regions under similar trademarks may mistakenly believe they emanate from the same ultimate source. While wines from one region of France are not identical to wines from another, they are obviously closely related products, i.e., French wines, and the evidence reveals that they are sold in the United States to the public at large through the same channels of trade.

For the foregoing reasons, these *du Pont* factors favor a finding of likelihood of confusion.

---

[19] Reply Brief, 10 TTABVUE 13.

[20] *Id*. at 12.

*C. Purchaser Sophistication*

Applicant argues that U.S. consumers of French wine are relatively sophisticated because "imported French wine [] is a luxury good, and a far cry from a 'low-cost, every-day consumer item.'"[21] The Examining Attorney, on the other hand, argues that "one does not need to be sophisticated about wine to know what he or she likes, and the fact that purchasers are sophisticated or knowledgeable in a particular field does not necessarily mean that they are sophisticated or knowledgeable in the field of trademarks or immune from source confusion."[22]

Wine purchasers are not necessarily sophisticated or careful in making their purchasing decisions, and where, as here, the goods are identified without any limitations as to trade channels, classes of consumers or conditions of sale, we must presume that Applicant's and Registrant's wine encompasses inexpensive or moderately-priced wine. *In re Opus One Inc.,* 60 USPQ2d 1812, 1817 (TTAB 2001); *In re Bercut-Vandervoort & Co.,* 229 USPQ2d 763 (TTAB 1986) (rejecting the applicant's arguments regarding the high cost and quality of its wine and the sophistication of its purchasers, where application identified goods merely as "wine");

---

[21] Appeal Brief, 7 TTABVUE 20. The quote is purportedly from an article about luxury goods, but it has not been made of record and we do not consider websites for which only links are provided. *See, e.g., In re Olin Corp.,* 124 USPQ2d 1327, 1332 n.15 (TTAB 2017) ("Because the information displayed at a link's Internet address can be changed or deleted, merely providing a link to a website is insufficient to make information from that site of record."); *In re Planalytics,* 70 USPQ2d 1453, 1458 (TTAB 2004) (providing a link to a website does not suffice to put information in the record because of the transitory nature of the information available through the link). We consider the statement merely as an expression of Applicant's position.

[22] 9 TTABVUE 12.

*see also, Stone Lion Capital*, 110 USPQ2d at 1162-63 ("Stone Lion effectively asks this court to disregard the broad scope of services recited in its application, and to instead rely on the parties' current investment practices … the Board properly considered *all* potential investors for the recited services, including ordinary consumers seeking to invest in services with no minimum investment requirement.") (emphasis in original). In any event, Applicant submitted evidence showing the average price of its pinot noir wine to be about $17 and the Saint-Emilion wines advertised together with Applicant's wine on the above-referenced websites range from about $15-30.[23] The evidence thus supports a finding that the identified goods include moderately priced wine. Accordingly, this *du Pont* factor is neutral.

*Summary*

We have considered all of the arguments and evidence of record as they pertain to the *du Pont* likelihood of confusion factors. We conclude that consumers familiar with Registrant's wine offered under the mark CHATEAU LAROQUE would be likely to believe, upon encountering Applicant's wine offered under its composite mark

---

[23] March 6, 2017 Request for Reconsideration at 53 (Applicant's wine price). While Applicant's evidence is relevant to show that wine can be sold at moderate prices, we do not consider the relevant goods to be in any way *restricted* to Applicant's actual products. Because its identification of goods is not so limited, we must consider Applicant's goods to include wines sold at all prices normal for such goods, including both less and more expensive wines than those Applicant sells. *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (absent limitations in the application, the Board must consider "all goods of the nature and type described").



that the goods originate with, are associated with, or are sponsored by the same entity.

**Decision:** The refusal to register under Section 2(d) is affirmed.

Opinion by Ritchie, concurring:

While I agree with the result reached by the majority, I must express disagreement with some of the stated rationale on which that result is based. The majority, citing *Citigroup, Inc.,* acknowledges, "the rights associated with Registrant's mark reside in the wording per se and not in any particular display." Nevertheless, the majority goes on to say that "we consider variations of depictions of standard character marks *only with regard to* 'font style, size, or color' of the 'words, letters, numbers, or any combination thereof.'" To the extent the majority would categorically exclude the possibility or depiction of designs from its analysis of standard character marks, I disagree.

The court in *Viterra* left "for future cases to determine the appropriate method of comparing design marks with standard character marks." *In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1910 (Fed. Cir. 2012). In doing so, though, the Court found it appropriate that the Board in that case had considered that a standard character mark could be displayed in a "similar" manner to a registered design mark. *Id.* at

1911. The Court continued on to say that "[s]uch a finding is not a departure from our case law. . ." [24] *Id.*

In this regard, the Court further referenced the prior case of *Squirtco v. Tomy Corp.,* 697 F.2d 1038, 1041, 216 USPQ 937 (Fed. Cir. 1983), stating specifically "we previously have rejected an applicant's argument that its standard character mark was distinct from a mark registered in stylized lettering with a design." 101 USPQ2d at 1909. I see no reason to question the wisdom of our primary reviewing court as so stated. *See Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC,* 124 USPQ2d 1184, 1187 (TTAB 2017); *ProMark Brands Inc. v. GFA Brands, Inc.,* 114 USPQ2d 1232, 1242 (TTAB 2015).

Indeed when an applicant seeks to register a design mark, and a registrant has prior rights in a mark in standard characters, it is not our province to surmise that the applicant does or does not have common law rights to the design on which the registrant may not encroach. Rather, we need only observe, consistent with our precedent, that the registrant, who does have protectable, exclusionary rights to the standard character mark, has rights to display of that mark in any "font style, size, or color," which may or may not include a design, including potentially a design similar to that displayed by the applicant.

---

[24] The Court also distinguished the case of *In re White Rock Distilleries, Inc.,* 92 USPQ2d 1282, 1284 (TTAB 2009). That case is inapposite here and distinguishable since the Board there found a standard character mark to be significantly different in sight, sound, appearance, connotation, and commercial impression from a cited design mark.

In this case, Registrant owns a registration for the mark CHATEAU LAROQUE, in standard character format. The Examining Attorney argues that "the registrant could choose to display its mark with a depiction of a house and grapevine."[25] Given the definition of "chateau," consumers may certainly expect a picture or design of a house or chateau to be depicted with Registrant's CHATEAU LAROQUE. In discussing applicant's mark as a depiction of a "particular chateau," the majority leaves opens the possibility of comparing designs. Thus, I find the pronouncement of the majority that it will not consider "design features" to be both unnecessary and ultimately unhelpful. Rather, I would find, as the majority implicitly seems to in its analysis of likelihood of confusion, that the Registrant's right to display of CHATEAU LAROQUE in any "font style, size, or color" includes designs that would make it

similar to the  mark sought by Applicant.

---

[25] 9 TTABVUE 7.